MICHIGAN BELL TELEPHONE COMPANY *v.*
PUBLIC SERVICE COMMISSION.

1. COURTS—SUPREME COURT—CONSTRUCTION OF OPINIONS.
   Statements made in an opinion of the Supreme Court must be construed in the light of the issue before the Court.

2. TELEGRAPHS AND TELEPHONES—CORPORATIONS—TELEPHONE COMPANIES—SEPARATE ENTITIES.
   Determination that domestic telephone corporation whose stock was owned by another corporation was a mere instrumentality of latter corporation for all purposes was not made in previous cases incident to determination as to status of contract between the 2 corporations under which the domestic corporation claimed the right to take credit as a proper operating charge for payments, arbitrarily fixed, made by it under the contract to the other corporation, especially where in such litigation and other cases the domestic company was found to have been conducting the business within this State and was treated as a distinct legal entity.

3. SAME—CORPORATE ENTITY—CONTRACTS WITH PARENT CORPORATION.
   Domestic telephone company was properly treated as a distinct corporate entity for the purpose of determining rate schedules, notwithstanding all shares of stock except directors' qualifying shares were owned by another corporation with which it had a contract for payment of a percentage of its gross revenues, where the domestic company carried on its business in this State pursuant to the authority granted by the statute under which it was incorporated and, subject to regulation by the State, filed rate schedules and has made reports to defendant public service commission.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 14 Am Jur, Courts § 79.
[2–28] 52 Am Jur, Telegraphs and Telephones § 56 *et seq.*
[2–28] Rate of return to which telephone company is entitled.   31 ALR 825.

4. SAME—CORPORATE IDENTITY—OWNERSHIP OF STOCK BY PARENT CORPORATION.

The ownership of the stock of an affiliated company and power of control by a parent corporation does not destroy the corporate identity of the subsidiary company rendering intrastate telephone service within this State.

5. SAME—EARNINGS.

A telephone company is entitled to earn a reasonable return on the fair value of its property devoted to the service for which the rates were prescribed (CL 1948, § 484.101 *et seq.*).

6. SAME—RATES—VALUE—ALIQUOT PART OF LOAN FUND MAINTAINED BY PARENT CORPORATION.

Proportionate part of fund of parent corporation which owned stock of domestic telephone company, and held by parent corporation for purpose of making loans to its affiliates was properly rejected by public service commission as an element of the rate base, since it was not property of the domestic company, a separate corporate entity, where book value of the latter company less depreciation was accepted as value of the property for intrastate rate-making purposes, no loan was actually made and substantial interest would have been charged for the use of the money had a loan been made (CL 1948, § 484.101 *et seq.*).

7. SAME—RATES—VALUE—ALIQUOT PART OF WORKING CAPITAL OF PARENT CORPORATION.

Portion of working capital of parent corporation, owning the stock of domestic telephone company, which was allocated to latter company was properly not included in intrastate rate base by public service commission, since it was not property of the domestic company, a separate corporate entity, where book value of the latter company less depreciation was accepted as value of the property for rate-making purposes (CL 1948, § 484.101 *et seq.*).

8. SAME—RATES—AVERAGE INVESTMENTS OF PARENT CORPORATION.

Inclusion in intrastate rate base for domestic telephone company of its items of property of parent corporation owning all of stock of the domestic company, consisting of parent corporation's (1) average investment in furniture and office equipment used in servicing the domestic company, (2) of its average investment in subsidiary devoted to research and development work, (3) average investment in home office devoted to general departments, (4) average net working capital for the general departments and (5) average

investment in apparatus, equipment and supplies to meet emergency needs of licensees, of which plaintiff domestic company was one, and the long lines department of the parent corporation was not an error of which plaintiff could complain (CL 1948, § 484.101 *et seq.*).

9. SAME—RATES—EVIDENCE—QUESTIONS FOR TRIER OF FACTS.

The determination of the public service commission on a disputed issue of fact in a telephone rate case is final unless such determination in its application results in the establishment by clear and convincing proof of a rate so low as to be confiscatory or so high as to be oppressive (CL 1948, § 484.-101 *et seq.*).

10. PUBLIC SERVICE COMMISSIONS—PUBLIC UTILITY EARNINGS— RATES.

What return a public utility shall be entitled to earn upon its invested capital, and what items shall be considered as properly going to make up the sum total of that invested capital, are questions of fact for the determination of the public service commission, and their conclusions thereon, upon which the rate is based, are unassailable unless, as a necessary result, it can be affirmatively asserted that the resultant rate is unreasonable and unlawful.

11. TELEGRAPHS AND TELEPHONES — RATES — EVIDENCE — QUESTION FOR TRIER OF FACTS.

The material items with reference to which there was differing testimony by witnesses for plaintiff, a domestic telephone company, and for defendant, the public service commission, are considered on appeal from trial court's order approving commission's order prescribing schedule of intrastate rates, since the trial court's order should not be set aside unless it appears that the commission's order was based on insufficient proofs or that the result was, as to plaintiff, unreasonable, confiscatory and unlawful (CL 1948, § 484.101 *et seq.*).

12. SAME—RATES—FUNDAMENTAL RESEARCH.

Public service commission's reduction of amount of charge allocated to plaintiff domestic telephone company by parent company for fundamental research relating to electrical communication conducted by laboratory affiliate of parent company of which the telephone company was also an affiliate, in fixing rates for plaintiff, *held*, not an arbitrary action, where there is evidence that the charge before reduction, substantially relieved a third affiliate, a manufacturing company, of charges it would have

had to bear had it been an independent organization instead of an affiliated company (CL 1948, § 484.101 *et seq.*).

13. SAME—PARENT COMPANY'S·FRANCHISE TAXES IN OTHER STATES.
Franchise taxes paid by parent company to other States for financial operations therein were not allocable charges to its wholly owned domestic telephone company in the establishment of intrastate rates in this State (CL 1948, § 484.101 *et seq.*).

14. SAME—CONFISCATORY RATES—BURDEN OF PROOF.
Plaintiff domestic telephone company which asserted that intrastate rates as fixed by public service commission were confiscatory had the burden of establishing such fact by clear and satisfactory evidence (CL 1948, § 484.101 *et seq.*).

15. SAME—RATES—COURTS—CONFISCATION.
Courts are without authority to set aside any rate for telephone service established by the public service commission, which is not so low as to be confiscatory (CL 1948, § 484.101 *et seq.*).

16. SAME—RATES—DUE PROCESS—DISCRETION OF PUBLIC SERVICE COMMISSION.
The public service commission is not bound to any single formula or combination of formulas in the establishment of intrastate telephone rates but is free to make pragmatic adjustments called for by particular circumstances and, once a fair hearing has been given, proper findings made and other statutory requirements satisfied, courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped (CL 1948, § 484.101 *et seq.*).

17. SAME—RATES—COURTS.
Judicial inquiry under the statute relative to regulation of intrastate telephone rates is at an end if the total effect of the public service commission's rate order cannot be said to be unjust and unreasonable, irrespective of the theory of the order or that the method employed may contain infirmities (CL 1948, § 484.101 *et seq.*).

18. PUBLIC SERVICE COMMISSIONS—RATES—VALUE.
A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncer-

taintics; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures.

19. SAME—RETURN ALLOWED PUBLIC UTILITY.

The return allowed a public utility by the public service commission should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

20. TELEGRAPHS AND TELEPHONES—INTRASTATE RATES—NET RETURN —BURDEN OF PROOF.

Intrastate rates which allowed plaintiff domestic telephone company a net return on the rate base somewhat in excess of $5\frac{1}{2}\%$ per annum, on the basis of findings of fact made by the public service commission supported by expert testimony as to ability to obtain money for financing its operations, but claimed by the plaintiff to be confiscatory, is not disturbed on appeal from order of the circuit court dismissing bill to review rates, where plaintiff failed to sustain its burden of proof (CL 1948, § 484.101 *et seq.*).

21. SAME—CIRCUMSTANCES AFFECTING INTRASTATE RATES.

The stable character of plaintiff domestic telephone company's business, its consistently steady growth over past years, its prospects for the future, its general position in the financial and business world, its lack of material competition within the State and its affiliation with a national telephone system affect the determination as to rates it should be permitted to charge for intrastate service (CL 1948, § 484.101 *et seq.*).

22. EVIDENCE—INTEREST RATES.

It is to a large extent a matter of common knowledge that low interest rates are paid on conservative loans.

23. PUBLIC SERVICE COMMISSIONS—CONFISCATORY RATES—COURTS.

A court must necessarily look to all facts and circumstances involved when it is claimed that a rate fixed by the public service commission for a public utility is confiscatory.

24. SAME—RATE OF RETURN.

A rate of return for a public utility that is unreasonably low under conditions obtaining in a particular locality or section might not be so regarded elsewhere if the factual situation involved is different, each case being determined with reference to the particular facts and circumstances, including then-existing economic conditions.

25. SAME—INTRASTATE TELEPHONE RATES—EVIDENCE.
   The public service commission was not in error in accepting expert testimony of its witnesses concerning the net return which a public utility must yield and other fiscal matters in order to attract investment capital in a hearing had for the determination of intrastate telephone rates (CL 1948, § 484.101 *et seq.*).

26. TELEGRAPHS AND TELEPHONES—RATES—EXAMINATION BY PUBLIC SERVICE COMMISSION.
   A telephone company has the right at any time to make an application to the public service commission for an examination and determination as to its rates (CL 1948, § 484.101 *et seq.*).

27. SAME—SUBSEQUENT ORDER AS TO RATES—JUDICIAL NOTICE.
   Judicial notice will not be taken of an October 14, 1948 order of the public service commission on appeal involving a determination of whether or not intrastate rates for telephone service fixed by the commission for period from January 1, 1946 to October 14, 1948, where on later date an order affecting subsequent rates was entered, since to do so might involve an inquiry into the basis of such later order, as the mere granting of an increase later does not in and of itself characterize an earlier order as unlawful and unreasonable nor necessarily corroborate testimony of witnesses given in the earlier proceeding (CL 1948, § 484.101 *et seq.*).

28. PUBLIC SERVICE COMMISSIONS—RATES—CONSTITUTIONAL LAW.
   A rate for a public utility may be made by a public service commission materially higher than is required to meet the constitutional test as to confiscation and still be regarded as reasonable.

29. TELEGRAPHS AND TELEPHONES—CONFISCATORY RATES—BURDEN OF PROOF.
   Plaintiff domestic telephone company *held*, to have failed to sustain its burden of proof that rate set by public service commission was confiscatory (CL 1948, § 484.101 *et seq.*).

Appeal from Ingham; Salmon (Marvin J.), J. Submitted October 12, 1951. (Docket No. 1, Calendar No. 44,858.)  Decided January 7, 1952.

Bill by Michigan Bell Telephone Company, a Michigan corporation, to review order of Michigan Public Service Commission fixing rates. Bill dis-

missed after hearing. Plaintiff appeals. Affirmed and remanded.

*Butzel, Eaman, Long, Gust & Kennedy* (*Thomas G. Long, James Morgan Smith* and *Jack H. Shuler,* of counsel), for plaintiff.

*Frank G. Millard,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Daniel J. O'Hara, Charles M. A. Martin* and *Albert J. Thorburn,* Assistants Attorney General, for defendant.

CARR, J. The plaintiff in this case is a Michigan corporation duly organized in accordance with the statutes of this State. It is now and for many years past has been engaged in carrying on a telephone business. In its operations, and particularly with reference to the matter of intrastate rates, it is subject to regulation* by the Michigan Public Service Commission, defendant herein.

The instant case concerns the validity of a rate order made by defendant in the exercise of its statutory powers. Under date of May 18, 1944, defendant gave notice to plaintiff and to other utilities similarly situated that under certain contingencies service rates and charges would become subject to adjustment as of January 1, 1944. On October 3d following, plaintiff was notified that an investigation would be held for the purpose of determining whether its profits were too high and also whether it was charging unnecessary and avoidable expenses against the public. Hearings were had and from the testimony before it defendant concluded that for the year 1944 plaintiff had made excessive depreciation charges, that payments made by it to the American Telephone & Telegraph Company for services

---

* See PA 1913, No 206, as amended (CL 1948, § 484.101 *et seq.* [Stat Ann § 22.1441 *et seq.*]).

rendered were too high, and that the amount set aside to be used in payment of the Federal excess profits tax was designed to cover an expense that was, in large part, avoidable. An order was made that plaintiff reduce its gross revenues for said year in the total amount of $3,500,000, the fund so created to be distributed to plaintiff's subscribers. Plaintiff appealed to the circuit court of Ingham county (CL 1948, § 484.114 [Stat Ann § 22.1454]) with the result that on June 12, 1945, the order was set aside on the ground that the commission was without power to make a retroactive order of the character in question. On appeal to this Court the decree was affirmed in *Michigan Bell Telephone Co.* v. *Public Service Commission,* 315 Mich 533 (66 PUR NS 287), decided September 11, 1946.

Defendant's order above referred to was designated as an "interim order" and the commission stated therein that there should be further proceedings to determine the matter of possible adjustments for 1945 and subsequent years. Such hearings were held, and under date of December 13, 1945, the commission made the order that is in question in the instant case. In terms it required the plaintiff to reduce its intrastate gross revenues for each of the calendar years 1944 and 1945 in the sum of $3,-500,000, and to refund such amounts to its subscribers. Schedules of intrastate rates and charges that should be effective from and after January 1, 1946, were also prescribed. On the 3d of January following, a supplemental order was made setting forth the method for distribution of the alleged overcharge for the years 1944 and 1945.

In accordance with the provisions of the statute, above cited, plaintiff appealed to the circuit court of Ingham county, alleging that the order of December 13, 1945, was unlawful, unreasonable, and confiscatory in that it constituted a taking of the

property of plaintiff without due process of law. A temporary injunction was issued by the trial court, restraining the enforcement of the order but conditioned on plaintiff's keeping in reserve the amounts collected by it in excess of the schedules prescribed by said order. The commission filed its answer to the bill of complaint and testimony was taken.

Pursuant to the order of the trial judge a transcript of the proceedings in circuit court was transmitted to the commission. On February 14, 1947, the latter made its order affirming the order of December 13, 1945, except in certain particulars. Modifications affecting rates for service in the Detroit zone were made and, in view of the decision of this Court in the case above cited, the provisions with reference to 1944 and 1945 were eliminated. Thus the order in question was in terms rendered prospective only.

In April, 1947, plaintiff sought to reopen the case for the purpose of taking further testimony. On July 7th following, a further or supplemental motion was made alleging increased expenditures in the operation of plaintiff's business and urging the necessity of considering such alleged developments. Because of the death of the circuit judge before whom the matter was pending, action on the motions was delayed. A formal order denying plaintiff's request was made November 3, 1948, the trial judge concluding that under the statute he was without jurisdiction to grant the relief sought. Thereupon plaintiff instituted a mandamus proceeding in this Court to compel the trial judge to set aside his order. The petition was denied. *Michigan Bell Telephone Co.* v. *Ingham Circuit Judge,* 325 Mich 228 (81 PUR NS 599).

In the meantime, under date of August 27, 1947, plaintiff made application to the commission for per-

mission to increase its rates. A hearing was had and on October 14, 1948, the commission entered an order approving rate schedules designed to increase the annual revenues of plaintiff in a substantial amount, as appears from the opinion of this Court in the mandamus proceeding above cited. In consequence the rate order involved in the suit at bar is limited to the period from January 1, 1946, to October 14, 1948. The decree of the circuit court sustained the action of the commission, and plaintiff has appealed.

The stock of the plaintiff corporation, other than qualifying shares owned by directors, is held by the American Telephone & Telegraph Company, herein referred to for the sake of convenience as the American. The latter company has a number of corporate affiliates, of which plaintiff is one, to which it renders services designed to promote and facilitate their operations. The aggregate cost of the assistance so furnished is allocated on bases that plaintiff claims to be fair, logical, and proportionate to the benefits received by each affiliate. At the time of the proceeding here in question there was in effect a so-called license contract by virtue of which plaintiff paid to the American for services performed $1\frac{1}{2}\%$ on its gross annual revenues. That plaintiff is greatly benefited by the supervisory counsel and assistance rendered to it by the American is not questioned. It appears that in connection with its operations the latter company maintains a sizable fund for the purpose of enabling it to loan money to its affiliates, if such action is deemed proper.

Based on their business transactions and on the close relationship existing between the 2 corporations it is the claim of the plaintiff that it should not be treated as a separate corporate entity, but, rather, as a department of the American. The de-

fendant commission declined to accept such theory. In determining a proper rate base in the proceeding before it, as well as in the consideration of what charges and expenses were properly allowable as costs of operation, it acted on the assumption that it was dealing with the plaintiff, that the American was not carrying on the business in question within the State, and that it was concerned with the dealings between the 2 corporations only to the extent that the operations of the Michigan company and its revenues and expenses were affected thereby.

The bill of complaint filed by plaintiff in the circuit court averred that the commission was in error in thus dealing with the problem of rates. In support of its claim in this respect plaintiff relies on certain language found in the opinion of this Court in *People, ex rel. Attorney General,* v. *Michigan Bell Telephone Co.,* 246 Mich 198. That was a proceeding in the nature of quo warranto instituted by the attorney general for the purpose of determining the right of the Michigan Bell Telephone Company to have considered in the determination of rates the amount of payments made by it to the American under contract. The opinion referred to the fact that the status of the agreement between the corporations, designated as the 4% license contract, was the question at issue in the case. The relationship between the parties was discussed at some length and statements made that must be construed in the light of the issue before the Court. The conclusion was reached that in view of all the facts involved the Michigan company was not entitled to credit, in computing rates, for the amounts paid by it, as fixed by the agreement, to the American. It is significant to note that the proceeding was against the Michigan Bell Telephone Company and that the final order was entered accordingly. The Court referred to the prior decisions of *City of*

*Detroit* v. *Michigan Railroad Commission,* 209 Mich 395 (PUR1920D 867), and *Michigan Public Utilities Commission* v. *Michigan State Telephone Co.,* 228 Mich 658 (PUR1925C 158). With reference thereto it was said:

"A basic and necessary concession involved in the very structure of that litigation was that the Michigan company was conducting and carrying on a telephone business in the State. The purpose of the litigation was to fix its rates in its business in the State."

Plaintiff's claim that the Court held the Michigan company to be a mere instrumentality of the American for all purposes is not tenable. An analysis of the entire opinion, read in the light of the question before the Court, is conclusive in this regard. Unlike the case at bar, and also unlike the prior decisions referred to by the Court, the matter under consideration was not the determination of proper rates, but, rather, the status of a contract under which the Michigan company was claiming the right to take credit as a proper operating charge for payments, arbitrarily fixed, made under a contract between it and the American.

What is said with reference to the quo warranto case is equally applicable with regard to *Michigan Bell Telephone Co.* v. *Michigan Public Utilities Commission,* 297 Mich 92 (39 PUR NS 111), on which plaintiff also relies. In that case, as in the case at bar, plaintiff instituted suit to set aside an order made by the defendant commission. Its position in the litigation was that of a distinct legal entity. It is on that basis that the State has heretofore dealt with the Michigan Bell Telephone Company. The plaintiff carries on its business here pursuant to the authority granted by the statute under which it is incorporated and subject to the right of regu-

lation by the State. It has filed rate schedules as it has been required to do and it has likewise made its reports to the defendant commission, and the predecessors thereof, as prescribed. In view of the relationship existing between plaintiff and the American, and also between plaintiff and the State of Michigan, the commission was not in error in treating plaintiff as a distinct corporate entity for the purpose of determining proper rate schedules.

The record indicates that the American occupies the same position with reference to its other affiliates as it does to the plaintiff. Such being the situation, the following language from the opinion of the United States supreme court in *Smith* v. *Illinois Bell Telephone Co.,* 282 US 133, 143, 144 (51 S Ct 65, 75 L ed 255), is squarely in point:

"The court found that 99% of the stock of the complainant, the Illinois company, is owned by the American Telephone & Telegraph Company which also owns substantially the same proportion of the stock of the Western Electric Company; that the Illinois and American companies unite in rendering long distance service under an arrangement for a division of tolls; that at the time to which the inquiry related, in October, 1923, there was in effect an agreement by which the Illinois company paid to the American company $4\frac{1}{2}\%$ of its gross revenues for rent of instruments and as compensation for engineering, executive, financial and other services; that a large part of the materials entering into the construction of the plant and equipment of the Illinois company were purchased from the Western Electric Company and much of its operating expense consisted of payments made under a contract with that company for apparatus and supplies. The court further found that the American company owned a controlling interest in 15 telephone companies which, in connection with other companies controlled by those subsidiaries and some companies

in which its interest was not controlling, were operated as a system with the avowed purpose of rendering a nation-wide and unified telephone service; that the American company had stated that 'the associated companies are specialists in local service problems, with local operating forces, identified and familiar with the needs of the communities they serve;' that 'the parent company undertakes the solution of the problems that are common to all,' and in this way there was provided a central authority equipped to perform adequately general functions, leaving to the local companies responsibility for local affairs.

"Upon these facts the city attacked the standing of the Illinois company as the real plaintiff in the case. The court overruled this contention, holding that the ownership of stock by the American company, and its power to control the Illinois company, did not destroy the distinct corporate identity of the Illinois company. The court pointed out that the order of the commission was directed against the Illinois company, and that it was treated as a corporation for the purpose of compelling it to establish the prescribed rates for service furnished by the operation of the property to which it had legal title. No ground appears for assailing this ruling. The fact that the relation of the Illinois company to the American company may demand close scrutiny, in dealing with certain questions which bear upon the validity of the rate order, cannot obscure the essential basis of that order, that is, that the commission was imposing its requirement upon a corporate organization engaged in an intrastate public service and, as such, amenable to a valid exercise of the commission's authority."

During the period in question here plaintiff was entitled to earn a reasonable return on the fair value of its property devoted to the service for which the rates were prescribed. In determining the rate base plaintiff's book values were accepted as cor-

rect. The amount of depreciation was then deducted. The commission concluded that the result obtained was fairly commensurate with the value of the property. Plaintiff does not challenge the accuracy of the method followed, but insists that it was entitled to have included as a part of the rate base its proportionate part of the fund held by the American for the purpose of making loans to affiliates. We think the commission correctly determined that such money could not be considered the property of the plaintiff on which it was entitled to earn a return. It is also claimed that the American maintains a working capital fund, that a portion thereof is allocated to the plaintiff, and that such portion should be included in the rate base. Plaintiff's argument in this regard is predicated on the theory that it is a mere instrumentality of the American and that it is the latter company that is actually carrying on the intrastate telephone business in Michigan. For the reasons before indicated, we are not in accord with such claim.

While expressing the opinion that it had the right to exclude from consideration as a part of the rate base items of property belonging to the American, the commission actually included for the year 1946 the sum of $1,697,000, made up of the following items:

"(1) The American Telephone & Telegraph Company's average investment in furniture and office equipment used in rendering license contract services;

"(2) The American Telephone & Telegraph Company's average investment in Bell Telephone Laboratories;

"(3) The American Telephone & Telegraph Company's average investment in 195 Broadway Corporation applicable to space occupied by the general departments. (The home office of the American

Telephone & Telegraph Company is located at 195 Broadway, New York City);

"(4) The American Telephone & Telegraph Company's average net working capital for the general departments; and

"(5) The American Telephone & Telegraph Company's average investment in apparatus, equipment and supplies to meet emergency needs of licensees and the American company's long lines department."

In including such amount the commission indicated, in its report made February 14, 1947, that it did so because of a desire to make certain that the return to the plaintiff should be well above the point of confiscation, and that such action was without prejudice to the right to reject the items in any future proceeding. In determining the rate base we find that the commission made no error of which plaintiff is entitled to complain.

In ascertaining the operating expenses properly chargeable to plaintiff's intrastate business the commission gave extended consideration to the so-called license contract, above mentioned. During the year 1944, to which the inquiry was specifically directed, the Michigan company paid to the American $1\frac{1}{2}\%$ of its gross earnings. It was estimated that for ensuing years the total amount of such payments would increase. Based on the testimony before it the commission concluded that there was no direct relation between the operating revenues of the plaintiff and the expense incurred by American in rendering the services in question. As we understand appellant's position here, it is not claimed that it is entitled to credit, as an operating expense, for the entire amount paid, but, rather, that the method followed by the American in apportioning to its affiliates, on bases deemed appropriate, the expense incurred in the performance of services

under contract should have been accepted by the commission.   Such method of allocation, and the bases therefor, were suggested by plaintiff's witness Harry C. Gretz, assistant comptroller of the American, in his testimony before the court.   In discussing the matter he said, in part:

"We follow the policy of accounting for the total cost, and then apportioning or allocating that total cost among the companies, by using certain factors which we believe properly measure the benefits, relative amount of benefits which the companies participating derive out of the services that are performed.

"Now, fundamentally, the problem of allocating or apportioning these costs of the American company among all of the licensee companies is no different from the problem of apportioning overheads of a company which has several departments, or a company which operates in several areas.   They are problems which accountants have to meet every day.

"Now, the problem, as I see it, does not become any more complicated because the service is performed by 1 company for other companies than if it were a single company, and there was a separate department performing those centralized services. In fact, the methods which we follow in making these allocations are equivalent to having just a single company with 1 department performing the services.   *   *   *

"Now, those costs are determined by the respective departments and they notify the comptroller's office how much should be deducted from their total cost for services which are rendered to the non-licensee companies.   Then we deduct that amount from the total, and that gives us the amount that is applicable to the licensee companies.   The rule followed in making the allocations is for the departments to break down their cost, and then to suggest factors which should be used as appropriate for

breaking down the cost among the several licensee companies. I work very closely with the departments, both in the breakdown of their cost and in the selection of the factors which are used to allocate those costs to the individual companies.

"We have been allocating costs by companies for quite a number of years. The records will include an allocation for each one of the years, although we usually do not summarize it by companies until it may be necessary in a rate case. However, beginning with the year 1944, we changed that practice, and we are now currently advising each one of the licensee companies of the total cost, and their allocation in a form similar to the one I am using now as an exhibit. The aggregate of the allocations just equals the total cost of the American company. There would be no advantage to the American company in allocating to any 1 company more than its share because if we allocated more than 1 company's share, some other company would have less allocated to it, and vice versa. If less is allocated to 1 company, some other company may have to pay more.

"These companies all pay on the basis of 1½% of the license contract, except for the long lines department. The long lines department pays on the basis of cost."

Expert witnesses testifying for the commission challenged the accuracy of the method followed by the American in making the allocations. The commission determined from the proofs that the apportionment to plaintiff did not reflect the cost to the American of the services for which it was entitled to charge plaintiff in the instant case. With reference to the year 1944, plaintiff claimed that it was entitled to credit as an operating expense in the amount of $960,000 of the total sum, somewhat in excess of $1,000,000, paid to the American. After discussing the various services rendered, the commission concluded that a maximum of $475,671 was

correctly charged, and that the intrastate portion thereof was $436,809. Plaintiff's claimed credit was reduced accordingly, and it now argues that such action was erroneous.

In support of its claim that the allocations made by the American should have been accepted, reliance is placed on the decision in *Southwestern Bell Telephone Co.* v. *State Corporation Commission,* 169 Kan 457 (219 P2d 361). Involved in said case was a statute requiring that in a rate proceeding before the State corporation commission the public utility concerned should establish the actual cost to its holding or affiliated companies of services, materials or supplies, furnished. The plaintiff in the case, an affiliate of the American Telephone & Telegraph Company, filed application for a rate increase showing, as a portion of its proofs in support thereof, the charges made against it for services rendered by the American. The showing so made was not contradicted or disputed. The corporation commission, however, deemed it insufficient and dismissed the application. On appeal the district court set aside the order, and the Supreme Court of the State affirmed the action of the trial court. In substance it was held that the uncontradicted testimony constituted a sufficient compliance with the statute. Of like import are *Pacific Telephone & Telegraph Co.* v. *Flagg,* 189 Or 370 (220 P2d 522), and *In re Northwestern Bell Telephone Co.,* — SD — (43 NW2d 553) (cert. denied 340 US 934 [71 S Ct 489, 95 L ed 675]), also cited by appellant. In each case the utility involved was an affiliate of the American Telephone & Telegraph Company, and the allowance of payments made to the latter corporation for services rendered under contract was at issue. As in the *Kansas Case, supra,* the testimony on behalf of the utility was not contradicted. It was held in each

case that the showing made was sufficient for the purposes of the pending proceeding.

In the case at bar the showing made on behalf of plaintiff with reference to the matter in question was, as above noted, challenged by expert witnesses on behalf of the commission. Such being the situation it devolved on the fact-finding body to determine which of the divergent views presented was correct. The trial court obviously reached the conclusion that the commission was not in error in accepting the testimony of its experts. In discussing a somewhat analogous situation, this Court said in *City of Detroit* v. *Michigan Railroad Commission, supra,* 433, 434:

"On matters involving the exercise of good common sense and judgment only, the determination of the commission must be held to be final unless such determination in its application results in the establishment by 'clear and convincing' proof of a rate so low as to be confiscatory or so high as to be oppressive. What return a public utility shall be entitled to earn upon its invested capital, and what items shall be considered as properly going to make up the sum total of that invested capital, are questions of fact for the determination of the commission, and their conclusions thereon, upon which the rate is based, are unassailable unless, as a necessary result, it can be affirmatively asserted that the resultant rate is unreasonable and unlawful.

"Between the point where a rate may be said to be so low as to be confiscatory and the point where it must be said to be so high as to be oppressive upon the public, there is a 'twilight zone' within which the judgment of the commission may operate without judicial interference. Assume that the commission, in determining the amount of the capital invested, allows as an element of the sum an amount which the court, if charged with the initial duty of determination, might find to be excessive or inadequate; or, assume that the commission, in the exer-

cise of its best judgment, permitted a rate of return upon the invested capital higher or lower than the court, under like circumstances, might believe to be proper—nevertheless, the court would not be warranted in interfering unless the rate, as established, was clearly unreasonable and unlawful."

The supreme court of the United States in *Groesbeck* v. *Duluth, South Shore & Atlantic Railway Company,* 250 US 607 (40 S Ct 38, 63 L ed 1167), in reviewing issues appealed to it from the trial court, declined to disturb the decree from which the appeal was taken, on the ground that it could not be said that there was error in following the method adopted for the division of expenses between freight and passenger service. In the case at bar the order of the trial court should not be set aside unless it appears that the conclusions of the commission in prescribing the schedule of rates involved were based on insufficient proofs, or that the result was as to plaintiff unreasonable, confiscatory and unlawful. It becomes necessary in consequence to consider the more material items with reference to which the witnesses for the plaintiff and for the commission differed in their testimony.

Development and research work for the Bell telephone system, comprising the American and its affiliates, is performed by the Bell Telephone Laboratories, Inc., a nonprofit corporation the stock of which is owned in equal proportions by the American and by the Western Electric Company, an affiliate. The cost of work done is charged either to the Western Electric or to the American. The method followed in the division of costs is determined by the latter corporation. The Western Electric Company is the manufacturing member of the system. It makes and sells to the other affiliates the greater part of the equipment used in connection with their operations. The record indicates that a

large part of the work of the Laboratories is of vital importance to the Western Electric. In making the division of expenses, however, it has apparently been the policy of the American to charge against the Western Electric only the cost of such part of the work as is directly related to the manufacturing of equipment. In the main, work of a basic and preliminary character has been charged to the American. The commission concluded that the method followed resulted in the assumption by the American, with consequent allocation to its affiliates, of too large a proportion of the total cost of the work in question.

The commission found that in 1944 the American assumed aggregate costs of $8,036,566 for development and research work. Counsel for plaintiff claim in their brief that for said year $4,118,533 was charged to Western Electric. A total of $279,675 was allocated to the plaintiff by the American. The commission reduced this to $45,258, concluding that the latter amount fairly represented the actual cost to the American of services rendered directly to the plaintiff. Such result was reached by eliminating items of expense that the commission thought were properly chargeable to the Western Electric as a legitimate part of the latter's manufacturing operations. The claim was advanced by witnesses for the commission that the method followed by the American resulted in relieving the Western Electric of a very material portion of the expense that it would be required to assume were it operating as an independent concern rather than as an affiliate of the telephone system. In this connection the assistant chief engineer of the commission, Verne H. Hufford, testifying before the court, said:

"The representatives of the American company have stated that their company pays the cost of development and research work which is mostly of a

basic and underlying character, including the acquiring of new knowledge and which is of interest and benefit to the operating companies, while Western Electric Company pays for work of a specific development and design character applicable to products of its manufacture.

"In either case the operating companies of the Bell system and the long lines department indirectly pay for substantially all of the development and research work performed by the Bell Laboratories.

"Basic knowledge means fundamental work of an underlying character in physics and mathematics and the pure sciences; and the specific work would be an improvement in either the art of manufacturing or in the performance of the particular object being manufactured by Western Electric Company.

"For the year 1925, the first year of the Laboratories' activities—it was organized that year—31.1% of the development and research work were charged to the American Telephone & Telegraph Company and included in the assigned costs of the license contract service.

"The relative amounts so charged have been gradually increased over the years, and as of 1944, 66.12% was charged to the American Telephone & Telegraph Co.

"By 5-year intervals, these percentages were as follows: in 1925, 31.1%; in 1930, 42.73%; in 1935, 57.05%; in 1940, 57.46%; and in 1944, 66.12%.

"The source of the information set forth in those figures are the reports of the Laboratories and of the American Telephone & Telegraph Company, and the data is graphically presented on a chart in the report that the committee filed."

Other witnesses for the commission also disagreed with the plan observed by the American with reference to the cost of the Laboratories' research and development work. Cyrus G. Hill, who qualified as an expert of extended experience, testified as follows:

"Many of the activities of the American company and of the Bell Telephone Laboratories are concerned entirely with plant extension and construction methods, methods of engineering and laying out plant extensions and method of constructing new plant. Other departments are concerned entirely with maintaining the existing plant, and some departments are concerned with a combination of both.

"Most companies in spreading overhead charges of this kind consider it correct accounting practice to allocate costs to the activities of the company to which they are directly related. In other words, overhead charges in connection with plant construction are usually allocated to plant construction; overhead charges in connection with operating expense are usually allocated to operating expense.

"The Michigan company capitalizes its direct construction expense, and it also capitalizes a part of the overhead or general office or executive expense which it considers related to construction expenditures. There is an account entitled expense charge construction, in which the company records those general overhead expenses for the various departments which it considers related to the construction of, or allocable to the construction of new plant, and therefore a capital charge.

"The Michigan company compensates the American company for those expenses on the basis of a percentage of revenues, and that account, known as general services and licenses, is included entirely as an operating expense. No part of it is capitalized."

Plaintiff's witness Dr. Oliver E. Buckley, president of Bell Telephone Laboratories, summarized in his testimony the nature of the work of his company, suggesting the theory as to division of costs contended for by plaintiff. He said in part:

"Bell Telephone Laboratories is responsible for technical advance and improvement in the Bell system. Their function extends all the way from the most fundamental research that relates to electrical

communication—telephony in particular—and carries through the investigation of new methods of communication, new materials, new types of devices, to the construction of research models of new devices, the experimental testing of new systems, through to the design and specification for manufacture of apparatus and equipment to serve the needs of the operating telephone companies.

"We actually make the detailed designs and drawings from which the apparatus and equipment are built. We go even farther, and follow the performance of new types of apparatus into the field. We prepare instructions for its installation, repair, and maintenance.

"We even follow the quality and performance of the apparatus long after it has gone into service in the field, and take advantage of the information that we get from studying its performance in the improvement of subsequent models of apparatus.

"It is a wider range of function than most research and development laboratories have.   *   *   *

"Well, most of the new ideas on telephone development, the development of new materials of communication, and new kinds of apparatus that might be made, originate within the Laboratories, or come about through the contacts of the research workers in the laboratory with the field forces of the telephone company, and with the manufacturing people in the Western Electric Company, and all are very close together.

"As ideas come up from within the organization, and around the needs of the telephone companies, as they are understood in laboratories from their contacts with the operating end of the Bell system, we develop or form a research and development plan, and work out programs of work which are recommended to the American Telephone & Telegraph Company, or to the Western Electric Company, depending on the character of the work, for approval; and it is on the basis of such approved plans of work that we proceed with our research and development."

It thus appears that the problem presented is one with reference to which the opinions of experts differ. It is impossible to make specific reference to all testimony bearing on the subject. The suggestion that under the method for division of the costs of Bell Laboratories observed by American the Western Electric is favored at the expense of plaintiff and the other affiliates of American is not without force. Certainly if Western Electric were operating independently it would be required to bear much expense that it now avoids. Based on the record before us, we cannot say that the commission acted arbitrarily, and without a sufficient showing in the proofs, in reducing the amount of the charge allocated to plaintiff.

As before noted the American has maintained a fund to be used for making loans to the so-called licensee companies. In the year 1944, it is claimed, $2,746,000 was so held for future use by the plaintiff. During the period in question in the instant case no loan was made to Michigan Bell Telephone Company from such fund. The record indicates that had the American advanced money for plaintiff's use the rate of interest charged would have been 3.92%. For the alleged service in maintaining the fund the plaintiff for the year 1944 was charged $140,326, that is, such amount was allocated to plaintiff as its proper proportion of the cost. The contract in force did not in terms require the making of loans, but it is not questioned that the fund existed to enable the American to advance money to its affiliates when and if deemed necessary by it. The commission disallowed the item on the ground that it did not represent the cost of a service actually rendered. We think the conclusion of the commission that the maintenance of the fund was a part of the operations of the American was correct. The record does not justify a finding that the proper performance

of its functions within the State required that plaintiff pay the cost of a fund maintained for the purpose of making loans to it.

In the course of its operations the American was required to pay for the year 1944 a franchise tax in the State of New York in the sum of $621,758, a New York excise tax amounting to $157,504, and a Massachusetts franchise tax aggregating $4,394. In addition, it paid $150,993 as a social security tax, $33,782 Federal excise tax, and $25,971 as a sales, use and occupancy tax, to the city of New York. The right of the American to allocate to its licensee affiliates the total amount of such taxes as a part of the license contract services rendered is claimed by plaintiff. The commission, however, determined that only the last 3 items were proper charges and that the amount of plaintiff's portion was $7,094. The action, in this regard, is supported by the testimony of the commission's witness Hufford. The record indicates that the excluded taxes were levied on the privilege of exercising the corporate franchises of the American. Such being the case, we think they constituted a burden resting on the American because of its financial operations in other States, and that no portion thereof was a proper charge against the plaintiff.

Other items with reference to which plaintiff questions the commission's action do not require specific discussion. None is of such size as to be of controlling importance. It is obvious that plaintiff's claims with reference to many of the items involved under the license contract, including those above considered, rest, in part at least, on the theory that plaintiff and the American should be treated together for the purposes of this case. For the reasons hereinbefore stated, we cannot agree with such claim. The commission dealt with plaintiff as a corporate entity conducting a utility business within

this State. The validity of its order must be determined accordingly. We find no material error with reference to the determination of operating expenses chargeable to plaintiff's intrastate business.

It is the claim of the appellant that, during the period here in question, it was entitled to a net revenue from its intrastate business in Michigan of not less than 6.81% annually on the rate base. Such claim rests largely on the testimony of plaintiff's chief accountant, Mr. Ferry B. Allen, whose conclusions in this regard were indicated in a computation (exhibit 196) set forth in the record. Said exhibit purported to be a summary of the capital and required earnings of the Bell system, with a statement of "required earnings" by the plaintiff. In effect the American and its affiliates were treated as an operating unit, the theory apparently being that each such affiliate might properly be charged with an obligation to pay its proportionate share of the aggregate amount that the witness claimed the American company was entitled to receive. The commission and the circuit court declined to accept the premise.

In the opinion rendered by the commission as the basis for the order of December 13, 1945, the plaintiff's net revenues for 1944, 1945 and 1946, under said order, were estimated, and the respective amounts indicated deemed adequate. In its report of February 14, 1947, the commission concluded that the approximate actual return for the year 1946 was, as shown by the monthly reports made by the plaintiff during such year, not less than 5.51% on the rate base as increased by the addition of certain items of property, above mentioned, belonging to the American. The result indicated was obtained by using a rate base fixed at $167,179,000, with an adjusted net income of $9,204,000. We find in the record a computation (exhibit 257) made by the general accounting department of the plaintiff un-

der date of March 20, 1947, from which it appears that the "adjusted rate of return—commission basis" for the year 1946 was 5.67%. The rate base used therein was somewhat lower than that employed by the commission in the computation made by it. Without further reference to details, it appears that during the year referred to the net return to the plaintiff was somewhat in excess of 5½% per annum.

Having asserted that the return permitted by the prescribed rates was, during the period involved in the instant suit, confiscatory, the burden of proof rested on the plaintiff to establish such fact by clear and satisfactory evidence. In *Federal Power Commission* v. *Natural Gas Pipeline Co.,* 315 US 575 (62 S Ct 736, 86 L ed 1037), the court had under consideration rates prescribed by the plaintiff for the defendant utility under the provisions of the natural gas act of 1938 (52 Stat 821 [15 USC, § 717]). The order of the commission was sustained, the court saying in part (p 585):

"The ultimate question for our decision is whether the rate prescribed by the commission is too low. The statute declares, section 4 (a), that the rates of natural gas companies subject to the act 'shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.' Section 5 (a) directs the commission to 'determine the just and reasonable rate' to be observed, and requires the commission to 'fix the same by order.' It also provides that 'the commission may order a decrease where existing rates are unjust * * * unlawful, or are not the lowest reasonable rates.' On review of the commission's orders by a circuit court of appeals as authorized by section 19 (b), the commission's findings of fact 'if supported by substantial evidence, shall be conclusive.'

"By long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not

confiscatory in the constitutional sense. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 US 287, 305 (53 S Ct 637, 77 L ed 1180); *Railroad Commission* v. *Pacific Gas & Electric Co.,* 302 US 388, 394, 395 (58 S Ct 334, 82 L ed 319); *Denver Union Stock Yard Co.* v. *United States,* 304 US 470, 475 (58 S Ct 990, 82 L ed 1469). Assuming that there is a zone of reasonableness within which the commission is free to fix a rate varying in amount and higher than a confiscatory rate, see *Banton* v. *Belt Line Railway Corp.,* 268 US 413, 422, 423 (45 S Ct 534, 69 L ed 1020); *Columbus Gas & Fuel Co.* v. *Public Utilities Commission,* 292 US 398 414 (54 S Ct 763, 78 L ed 1327); *Denver Union Stock Yard Co.* v. *United States, supra,* 483, the commission is also free under section 5 (a) to decrease any rate which is not the 'lowest reasonable rate.' It follows that the Congressional standard prescribed by this statute coincides with that of the Constitution, and that the courts are without authority under the statute to set aside as too low any 'reasonable rate' adopted by the commission which is consistent with constitutional requirements.

"The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

Following a reference to the above-cited case, it was said in *Federal Power Commission* v. *Hope Nat-*

*ural Gas Co.,* 320 US 591, 602 (64 S Ct 281, 88 L ed 333):

"It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. *Cf. Railroad Commission* v. *Cumberland Telephone & Telegraph Co.,* 212 US 414 (29 S Ct 357, 53 L ed 577); *Lindheimer* v. *Illinois Bell Tel. Co.,* 292 US 151, 164, 169 (54 S Ct 658, 78 L ed 1191); *Railroad Commission* v. *Pacific Gas & Electric Co.,* 302 US 388, 401 (58 S Ct 334, 82 L ed 319)."

See, also, *City of Detroit* v. *Michigan Railroad Commission, supra;* 16 CJS, p 1456.

In considering the issue of confiscation in a case of this nature, it was said in *Smith* v. *Illinois Bell Telephone Company, supra:*

"In determining what is a confiscatory regulation of rates, it is necessary to consider the actual effect of the rates imposed in the light of the utility's situation, its requirements and opportunities. As was said in *United Railways & Electric Co.* v. *West,* 280 US 234, 249, 250 (50 S Ct 123, 74 L ed 390), a rule as to rate of return can not be laid down which would apply uniformly to all sorts of utilities; 'what may be a fair return for one may be inadequate for another, depending upon circumstances, locality and risk.' In that case the court restated the general rule in the language of the opinion in *Bluefield Waterworks & Improvement Co.* v. *Public Service*

*Commission,* 262 US 679, 692, 693 (43 S Ct 675, 67 L ed 1176), as follows: 'What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.' "

Applying the principles recognized in the cases above cited and in other decisions of like import, may it be said that the plaintiff sustained the burden of proof resting on it and established that the order of the defendant commission in question here was unreasonable and unlawful on the ground that the rates prescribed thereby were confiscatory? On this phase of the controversy the theories and claims of plaintiff's witnesses, particularly Mr. Allen, were challenged by the commission's expert witness Dr. Ralph E. Badger. Dr. Badger, whose testimony indicated long experience and study in the field of economics, testified at some length with reference to interest rates on loans to business corporations. Such testimony was not disputed and was accepted by the commission as indicating ability on the plaintiff's part to obtain at relatively low cost such sums

as it might reasonably require in financing its operations. Plaintiff's accountant Mr. Allen approached the consideration of the matter from the standpoint of prior operations and with reference, as before indicated, to the functioning of the Bell system. The acceptance of the proofs relating to the cost of capital to a corporation of plaintiff's established operations, prestige and stability, led the commission to the conclusion that the rate of return for 1946, and the rates estimated for the balance of the period in question here, were not confiscatory and were, in fact, sufficient to enable plaintiff to meet the obligations resting on it as an operating utility.

The matter of capital costs is obviously of prime importance in determining the issue of confiscation raised by plaintiff. Dr. Badger's conclusions with reference thereto were set forth in an exhibit prepared by him, and summarized in his testimony as follows:

"Exhibit 224 shows the overall cost of capital to a company on the assumption that it is going to finance to the point where bond interest absorbs 30% of the total income available; the balance of 70% is allocated to stock payments, where the assumed cost of the capital raised by bonds is to the company 2.735%; and where the assumed cost of the capital acquired by stocks is 6.56%. On that basis, the overall estimated cost of capital would be 4.62%; and those assumptions would result in a capital structure of 50.69% in bonds, and 49.31% in stocks. I would consider such a capital structure to be a reasonable structure in the utility industry, or in the telephone industry.

"I am not suggesting this as an ideal structure or a structure that any company should or should not follow. I am simply saying that on the basis of the figures previously presented, it is entirely consistent with those figures.

"The utility industry in a great many cases has a capital structure which absorbs considerably more than 30% for fixed charges. The Bell system, as a whole, on a consolidated basis, absorbs somewhat less than that figure, a figure running 25% or, in some cases, less than 25%.

"All Bell telephone companies combined show capital structure absorbing between 25 and 30% of the total income available through fixed charges. Furthermore, the utility industry, as a whole, is financed on a capital structure, as we have already seen which shows out of total capital bonds in the amount of approximately 46%; preferred stock in the amount of approximately 15%; which would raise the amount of fixed income-bearing securities from 41 to 61%, and common stock and surplus in the amount of some 39%. So that this capital structure is not inconsistent with capital structures that already exist extensively in the utility industry."

Plaintiff is admittedly entitled to such a return as will permit it to render proper service to the public within the scope of its operations, to meet its financial obligations, and to inspire confidence on the part of investment capital. Exhibits were introduced before the circuit court indicating the return on invested capital received during stated periods by various types of industrial concerns, including corporations engaged in manufacturing businesses. It was shown that the return from such enterprises fluctuated from time to time to a far greater extent than have the earnings of the plaintiff. The stable character of plaintiff's business, its consistently steady growth over past years, its prospects for the future, and the general position that it occupies in the financial and business world, are matters affecting the determination of the question before us. Our attention is not challenged to anything in the record indicating any material competition within the State.

It is doubtless true also that its affiliation with the Bell system operates to its advantage.

Plaintiff is not entitled to a rate of return on its intrastate business comparable to the profit that an investor in more speculative enterprises might receive. *Smith* v. *Illinois Bell Telephone Co., supra.* The record does not establish that during the period in question, from January 1, 1946, until the order of December 13, 1945, was superseded by the subsequent order of the commission, capital investments in businesses comparable to that of plaintiff from the standpoint of prospects and stability earned a return materially higher than is here involved. Neither is such result indicated by general economic conditions of which we may take notice. The relatively low interest rates paid on conservative loans, to which Dr. Badger testified, is, to a large extent, a matter of common knowledge.

In dealing with the issue of confiscation in any case the court must necessarily look to all facts and circumstances involved. A rate of return that is unreasonably low under conditions obtaining in a particular locality or section obviously might not be so regarded elsewhere if the factual situation involved is different. In *Willcox* v. *Consolidated Gas Co.,* 212 US 19 (29 S Ct 192, 53 L ed 382, 48 LRA NS 1134, 15 Ann Cas 1034), it was held that 6% upon the value of the property of the utility actually used in the public service was sufficient to avoid a claim of confiscation for the reason, among others, that a return of such amount was commensurate at the time with the return on investments of a like degree of safety. In *Alexandria Water Co.* v. *City Council of Alexandria,* 163 Va 512 (177 SE 454), the court declined to hold confiscatory rates yielding a net return of 4.98%, some emphasis being placed on the economic conditions then existing. In *State* v. *Tri-State Telephone & Telegraph Co.,*

204 Minn 516 (284 NW 294), the court sustained rates permitting a return of less than 6%, and for 1 of the years involved approximately 5.4%, against a claim of confiscation. In other instances in which the rate of return realized was materially lower than in the case at bar courts have held the constitutional mandate violated. See *Banton* v. *Belt Line Railway Corp.*, 268 US 413 (45 S Ct 534, 69 L ed 1020); *West* v. *Chesapeake & Potomac Telephone Co.*, 295 US 662 (55 S Ct 894, 79 L ed 1640).

The conclusion, above indicated, to the effect that each case of this character must be determined with reference to the particular facts and circumstances involved, is fully supported by authority. In the case at bar it may not be said that the commission was in error in accepting the testimony of its witnesses concerning the matters above considered. Nor may it be said with the requisite degree of certainty that the rate schedules fixed by the order of December 13, 1945, were confiscatory throughout the period involved in the instant case, that is, from January 1, 1946, to the effective date of the superseding order of the commission. Such period was not so extended as to require that separate consideration be given to the different years, or fractions of years, therein. Plaintiff had the right at any time during such period to make application to the commission for an examination of the question and a determination with reference to its rates. As hereinbefore noted, it, on August 27, 1947, exercised the privilege granted to it by the statute. This phase of the situation was referred to by this Court in *Michigan Bell Telephone Co.* v. *Ingham Circuit Judge, supra.* The statements there made need not be repeated. It was held that the trial court was correct in his conclusion that under the statute he did not have the requisite authority to reopen the matter for further proofs after the return of the defendant's report on

February 14, 1947. That decision disposes of the issue, sought to be raised by plaintiff in the case at bar, that it was prejudiced because of the refusal to take additional testimony. Further discussion of the matter is not required.

Plaintiff's contention that this Court should take judicial notice of the 1948 order of the commission granting rate increases on intrastate service is not tenable. Such action might well involve an inquiry into the basis for the order. The mere granting of the increase does not in and of itself characterize the order involved in the case at bar as unlawful and unreasonable, nor does it necessarily corroborate the testimony of plaintiff's witnesses in this proceeding. As has been pointed out in numerous decisions, a rate may be made by a legislative body, or by a legislative agency, materially higher than is required to meet the constitutional test, and still be regarded as reasonable. *City of Detroit* v. *Michigan Railroad Commission, supra; Federal Power Commission* v. *Natural Gas Pipeline Company, supra; Alabama Public Service Commission* v. *Southern Bell Telephone & Telegraph Co.,* 253 Ala 1 (42 So2d 655). The question in the instant case, as above emphasized, concerns the alleged confiscatory character of the rates involved. On such issue we conclude that plaintiff failed to sustain the burden of proof resting on it.

The order of the circuit court is affirmed, with costs to defendant, and the cause is remanded for further proceedings.

NORTH, C. J., and DETHMERS, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.