CITY OF ISHPEMING v. PUBLIC SERVICE COMMISSION.

1. Electricity—Franchises—Uniform Rate for 10-County Area.
   Uniform rate for supplying electricity to 10-county area in which plaintiff city was located, as established by order of public service commission met requirement of 1888 franchise for such purpose, granted by city, that "the charge for such electricity shall not exceed the average charge made for the same where supplied within a radius of 100 miles of this city" (CL 1948, § 460.557).

2. Same — Contracts — Franchises — Ordinances — Charters —. Public Service Commission — Rates.
   Contract rights of plaintiff city relative to rates for supplying electricity to city or to its inhabitants, made between the city and the present supplier's predecessor, in settlement of certain differences, maintaining the status quo as to rates for a 3-year period, and containing a provision that neither party was waiving any of their respective claims or rights concerning the franchise rights of the utility to serve the city; a later contract for 5-year period also now expired between plaintiff and defendant relative to supplying electricity for street lighting purposes; charters and ordinances adopted by the city, neither of which franchises, charters, or ordinances require negotiation of rates between the city and the supplier, held, not to have prevented the defendant public service commission from

---

References for Points in Headnotes

[1, 12]  43 Am Jur, Public Utilities and Services § 100 et seq.
[2, 5, 6]  43 Am Jur, Public Utilities and Services § 201 et seq.
[3, 4]  43 Am Jur, Public Utilities and Services §§ 171–177.
   Discrimination in the operation of a municipal utility.   50 ALR 126.
[7]  2 Am Jur 2d, Administrative Law § 384.
[8]  43 Am Jur, Public Utilities and Services §§ 185–191, 226.
[9]  43 Am Jur, Public Utilities and Services § 222.

[10, 11]  43 Am Jur, Public Utilities and Services § 225 et seq.
[13]  14 Am Jur, Costs § 91.

presently exercising its authority to fix and prescribe uniform rates and charges for utility services rendered by the defendant supplier over 10-county area, including appellant city (CL 1948, § 460.557).

3. SAME—DISCRIMINATION IN RATES—PUBLIC SERVICE COMMISSION.
   The public service commission has a right and duty to eliminate discrimination in rates charged consumers of electricity by supplier thereof for like contemporaneous service rendered under similar circumstances and conditions (CL 1948, § 460.557).

4. SAME—ELIMINATION OF DISCRIMINATION.
   A proceeding whereby the public service commission ultimately issued an order requiring the supplier of electricity in a 10-county area to charge rates that were uniform throughout the area in which the service was now rendered on an integrated basis but, for historical reasons 4 different and disparate rate schedules had theretofore been in effect, constituted a situation requiring the commission to eliminate discrimination as it was required to do under controlling statute (CL 1948, § 460.557).

5. SAME—WHOLESALE BASIS—UNIFORM RATES OVER 10-COUNTY AREA.
   The public service commission was justified and properly exercised its jurisdiction in allowing defendant supplier of electricity opportunity to work out particular problems peculiar to purchaser of the service on a wholesale basis when establishing uniform rates on an area basis in 10-county area served by such defendant, with the understanding that the commission would take such action, ultimately, as was necessary to protect the public interests and the respective rights of the parties, especially where the severance resulted in a reduction of the revenues of the supplier (CL 1948, § 460.557).

6. SAME—FINDINGS OF PUBLIC SERVICE COMMISSION—EVIDENCE—UNIFORM RATES.
   Competent evidence adduced at hearing before the public service commission supported its findings that 4 separate service areas of defendant supplier of electricity are interconnected and operated as 1 integrated system with more dependable service; that appellant city, whose rates were increased when rates throughout 10-county area were made uniform, was not entitled to a continuation of existing rate disparities, now that it was a part of the integrated system; that uniform rates throughout the system are in the public interest so that customers throughout the area will be charged the same rates for like service rendered under similar circumstances and conditions; and that the net operating income resulting in a rate

of return of 6.36% was not in excess of the amount required by the supplier to maintain its financial standing and capital-raising ability at satisfactory levels, and that such rate was a fair rate to the consuming public (CL 1948, § 460.557).

7. ADMINISTRATIVE LAW—FORMAL INTRODUCTION OF EVIDENCE.
   Formal introduction of evidence upon which an administrative decision is based is not necessary where all the parties know that such evidence has been received by the administrative authority.

8. ELECTRICITY—RATES—EVIDENCE—JUDICIAL NOTICE OF REPORTS ON FILE.
   Claim by appellant city that public service commission was not legally authorized to take judicial notice of information contained in reports by supplier of electricity in commission's file but not offered in evidence at hearing in proceeding to establish uniform rates throughout 10-county area, including appellant city, where appellant had full and adequate opportunities to investigate the data and information contained in such reports, made no objections to the commission staff's conclusions and testimony based thereon, never claimed reports were untrue or unreliable or had been misinterpreted or that appellant had been prejudiced *held*, without merit on judicial review of order made (CL 1948, § 460.557).

9. PUBLIC SERVICE COMMISSIONS—ORDERS—BURDEN OF SHOWING INVALIDITY.
   Party who complains of an order of the public service commission has the burden of proof to show by clear and satisfactory evidence that the order is unlawful or unreasonable, as the case may be (CL 1948, §§ 460.4, 460.54; CLS 1956, § 462.26).

10. APPEAL AND ERROR—PUBLIC SERVICE COMMISSIONS—ISSUE OF FACT—EVIDENCE.
   The Supreme Court will not substitute its judgment for that of the public service commission on issues of fact, where the commission's findings are supported by competent evidence.

11. SAME—STATUTES—DISCRETION OF COMMISSION—SUPREME COURT.
   It must clearly appear that there was a failure of the public service commission to follow some mandatory provision of a pertinent statute or that the commission was guilty of an abuse of discretion in the exercise of its judgment before the Supreme Court will supplant the decision and order of the commission with an order of the Supreme Court.

12. ELECTRICITY—UNIFORM RATES FOR INTEGRATED AREA—INCREASE OF RATES FOR APPELLANT CITY.

The legislative mandate that in fixing rates to be charged by supplier of electricity the public service commission "shall consider and give due weight to all lawful elements properly to be considered to enable it to determine the just and reasonable price" *held*, to have been fully met by the commission at hearing which resulted in an order making uniform the rates to be charged after integration of 4 separate areas into 1 system which provided more dependable service for an area consisting of 10 counties, and which increased the rates charged in appellant city (CL 1948, § 460.557).

13. COSTS—PUBLIC QUESTION—UNIFORM RATES FOR ELECTRIC SERVICE IN INTEGRATED AREA.

No costs are allowed on appeal by plaintiff city from decree of circuit court upholding public service commission's order making uniform the rates charged consumers of electricity in 10-county area in which theretofore there had been 4 separate rate schedules for 4 areas now integrated into 1 system, a public question being involved (CL 1948, § 460.557).

Appeal from Ingham; Coash (Louis E.), J. Submitted December 7, 1962. (Calendar No. 123, Docket No. 49,823.) Decided May 9, 1963.

Bill by the City of Ishpeming and the City of Munising, both municipal corporations, against the Michigan Public Service Commission, with the Upper Penninsula Power Company, a Michigan corporation, added as party defendant, to vacate or set aside commission's orders establishing uniform rates for service in an integrated area. Orders determined valid. Plaintiff City of Ishpeming appeals. Affirmed.

*Albert W. Hooper,* for plaintiff City of Ishpeming.

*Frank J. Kelley,* Attorney General, *Eugene Krasicky,* Solicitor General, *Benjamin F. Gibson* and *Hugh B. Anderson,* Assistant Attorneys General, for defendant commission.

Snyder, Loomis & Ewert (Plummer Snyder, George W. Loomis, and Rodger T. Ederer, of counsel), for defendant Upper Penninsula Power Company.

KELLY, J. The Upper Peninsula Power Company (hereinafter referred to as the company) renders a similar service with a common facility to an integrated area consisting of the counties of Alger, Baraga, Delta, Houghton, Keweenaw, Mackinac, Marquette, Menominee, Ontonagon, and Schoolcraft.

The public service commission (hereinafter referred to as the commission), on March 18, 1960, requested that the company eliminate the 4 separate rate schedules being charged for similar service in the area and develop an area uniform rate.

The company complied with the commission's request and filed an application with the commission for approval of a uniform rate it had developed, which resulted in reducing the company's 1959 earnings by $12,000.

On July 27, 1961, the commission entered an order creating a uniform rate for the area which increased the rate in Ishpeming and Munising, and these 2 cities appealed the order to the Ingham county circuit court. From a decree upholding the commission's order, the city of Ishpeming appeals. Munising did not appeal.

The city of Ishpeming appeals, claiming the court erred (1) in approving the rates governing the sale of electric energy within the city of Ishpeming as the commission lacked jurisdiction because of franchises, contracts, or ordinances, establishing the rates; (2) in holding that the commission did not violate the provisions of CL 1948, § 460.557 (Stat Ann § 22.157), in establishing the rate upon uniformity; (3) in holding that in establishing uniform rates the commission could take judicial notice of

official reports filed with the commission by the company and made available to the city of Ishpeming; (4) in holding that the matter of instituting and conducting the hearing did not violate due process.

1. Appellant claims the commission could not legally establish rates for Ishpeming because of the Higgins and the Cliffs Power & Light Company franchises; the street lighting, and the March 7, 1945, contracts; the 1948 ordinance; and the provisions of the city charter.

The city granted H. C. Higgins a franchise in 1888, which did not contain a provision requiring the grantee to negotiate with the city as to rates, the sole provision in this franchise pertaining to rates being found in section 8, which reads in part that "the charge for such electricity shall not exceed the average charge made for the same where supplied within a radius of 100 miles of this city."

The rate established by the commission meets this requirement of section 8 of the Higgins franchise.

The city entered into a contract March 7, 1945, with Michigan Gas & Electric Company (appellee's predecessor), which contract, after stating that certain differences had arisen between the company and the city over rates and the city had commenced proceedings before the Michigan Public Service Commission seeking an adjustment of the rates, established residential and commercial light rates, with the provision:

"During the period of 3 years from and after the dismissal of the presently pending proceedings as herein agreed, the city will not instigate or prosecute or take any steps or proceedings looking toward a further readjustment of the company's rates for electricity, heat, light or power either to the city or to its inhabitants, and the company is hereby released from any obligation to reduce its street lighting rate

under article 8 of the contract between the company and the city dated July 14, 1943."

This 1945 contract concluded with a provision that neither the city nor the utility was waiving any of their respective claims or rights concerning the franchise rights of the utility to serve within the city.

The city, by a 1948 ordinance, authorized the company's predecessor (Cliffs Power & Light Company) and "its successors and assigns" the right to use the streets for the construction and maintenance of electric transmission lines. The ordinance did not regulate rates, and section 3 of this ordinance reads in part as follows:

"If the Cliffs Power & Light Company, its successors or assigns, shall at any time undertake to supply the consumers of said city with electricity for light or other purposes, it shall be under such rules and regulations as the city council shall from time to time prescribe under the authority granted by section 12.3 and 12.4 of the charter of the city of Ishpeming."

The company acquired distribution properties from Michigan Gas & Electric Company in 1953, and commenced rendering electric service to the city.

December 17, 1957, the city and the company entered into a 5-year "Street Lighting Contract" whereby the city agreed that it would take from the company during the 5-year period all electric energy which it shall require for lighting all streets within the municipal limits, and the commission's August 13, 1961, order recognized its lack of jurisdiction in regard to the rates established in this street lighting contract.

The city offered in evidence before the commission the city charter adopted on December 7, 1943, and the city charter adopted on June 15, 1960. Both of

these charters, in regard to franchises, contained similar provisions, as follows:

"All franchises heretofore granted by the city of Ishpeming and now in operation shall continue until the expiration of such franchises. All irrevocable public utility franchises and all renewals, extensions and amendments thereof shall be granted only by ordinance. No such ordinance shall be adopted before 30 days after application therefor has been filed with the city council, nor until a full public hearing has been held thereon. No exclusive franchise shall ever be granted and no franchise shall be granted for a longer term than 30 years. No franchise shall be transferable, directly or indirectly, except with the approval of the city council expressed by ordinance."

Appellant cites *City of Mt. Pleasant* v. *Michigan Consolidated Gas Company*, 325 Mich 501 (81 PUR NS 589), as authority sustaining its contention that the authority of the commission could not be invoked until good faith attempts had been made to reach an agreement between the company and the city as to rates and proof that said negotiations resulted in failure.

The pertinent section of the Mt. Pleasant franchise reads (p 507):

" 'Sec. 7. Alteration of rates. The rates specified in this franchise shall remain in force throughout the term of this franchise, subject to the following provisions: At the end of 3 years and at any time thereafter from and after the date of this franchise, said rates with the mutual consent of said grantee, successors and assigns, and the city commission of the city of Mount Pleasant, Michigan, or its successors, may be reviewed, altered and changed.

" 'In the event that said grantee, its successors and assigns, and the city commission of Mount Pleasant, Michigan, or its successors cannot agree to an altered or changed rate, then either

party, namely said grantee, its successors or assigns or the city of Mount Pleasant, Michigan, acting by its duly authorized representatives, may apply to the Michigan public utilities commission (to whom jurisdiction to fix and alter gas rates in said city is hereby granted and conferred) to fix and establish rates in which case the rates so fixed, if just and reasonable, shall prevail.' "

In the present case neither the Higgins nor Cliffs franchise contains any provision requiring negotiations such as existed in the basic language of the Mt. Pleasant franchise.

There is no provision in the charters, the contracts, or the ordinances, that prevented the commission in the present case from exercising its statutory jurisdiction and authority to fix and prescribe rates and charges for utility services rendered by the company for the city of Ishpeming.

2. Appellant contends that the commission erred "in establishing a rate based upon uniformity and not upon the elements to be considered in the statute," being PA 1909, No 106, §7, as amended (CL 1948, § 460.557 [Stat Ann § 22.157]).

March 18, 1960, the chairman of the commission notified the president of the company as follows:

"The commission's attention has recently been called to a disparity that exists in your rates for electric service.

"Your filed rates are presently contained in schedules of rates, M.P.S.C. Nos. 1, 2, 3, and 4. The commission is aware that schedules M.P.S.C. Nos. 2, 3, and 4 contain historical rates previously authorized for certain other electric companies, the properties of which have been acquired by Upper Peninsula Power Company.

"It is our understanding that all of your service areas except the Iron Range Division are now operated on an integrated basis and there no longer

appears to be good reason for maintaining separate rate schedules representing historical rates.

"Please take immediate steps to inaugurate a study leading to the adoption of uniform rates to be effective in the integrated service areas."

That the commission had a right and duty to eliminate discrimination is evidenced by the statutory provision (PA 1909, No 106, § 7, as amended) which states:

"No consumer shall at any time be charged more or less than other consumers are charged for like contemporaneous service rendered under similar circumstances and conditions."

The commission submits "that the matter before the commission was 'a discrimination case,' " stating: "The commission in the proceedings before it was not concerned with the reasonableness of the rates in this sense, but, rather, as to whether as they now exist are unduly discriminatory and preferential to certain consumers of the same class."

In support of its claim that the commission failed to meet the statutory requirements, appellant states:

"It certainly does not seem possible that the commission can, either on its own motion or on complaint of any party, increase or decrease rates for electrical energy that were never in truth or fact ever established by the public service commission at any hearing where the cost of service was involved. There was testimony to the effect that the Upper Peninsula Power Company did, after acquiring the Cliffs Power & Light Company and the Michigan Gas & Electric Company, make certain improvements to the system in the area and such improvements were necessary to bring the system up to standard and alleviate the shortage of electrical energy, but even with this testimony it had no effect on the determination of rates because the rates were pro-

posed simply on the basis that such rates would produce for the company the same amount of revenue that it received in the year 1959. There is no place in the statute that even indicates that a rate can be determined solely for the purpose of accomplishing a certain year's income and any rate determined as proposed by the power company certainly violates the statutory provisions. * * *

"The statute, CL 1948, § 460.557 (Stat Ann § 22.157), establishes the unit for contiguous communities and no place in the statute is there any provision or requirement for a uniform rate throughout the whole system other than that no one shall be charged a different rate for service under like and similar circumstances, and this means that the commission has to investigate the circumstances under which the power is produced and distributed. * * *

"The commission did not have before it all of the elements required to be taken into consideration as set forth in CL 1948, § 460.557 (Stat Ann § 22.157)."

CL 1948, § 460.557, provides, in part:

"In determining the proper price, the commission shall consider and give due weight to all lawful elements properly to be considered to enable it to determine the just and reasonable price to be fixed for supplying electricity, including cost, reasonable return on the fair value of all property used in the service, depreciation, obsolescence, risks of business, value of service to the consumer, the connected load, the hours of the day when used and the quantity used each month: Provided, however, That the commission shall in no case have power to change or alter the price fixed in or regulated by or under any franchise heretofore or hereafter granted by any city, village or township: Provided further, Where identical or substantially identical rates prevail or are established, or shall hereafter be established in 2 or more contiguous municipalities or communities served or whose inhabitants are served by the same

person, firm or corporation, the territory so served and to be served shall be treated as a unit for the purpose of fixing rates and no such rate or rates shall be changed with respect to 1 or more of such municipalities or communities so as to establish any difference of rate within the territory so served, unless and until it shall be shown that the continuance of such identical or substantially identical rate or rates will work substantial hardship to some municipality or person, firm or corporation affected thereby.   The prices, rates and charges of every electric utility shall be just and reasonable and no consumer shall at any time be charged more or less than. other consumers are charged for like contemporaneous service rendered under similar circumstances and conditions, and if any electric utility doing business within this State shall directly or indirectly by any special rate, rebate, draw-back or other device, charge, demand, collect or receive from any person or persons, copartnership or corporation, a greater or less compensation for any service rendered, furnished or performed, than it charges, demands, collects or receives from any other person, or persons, copartnership or corporation, for rendering, furnishing or performing for him or them a like contemporaneous service, such electric utility shall be guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

The year 1959 was the first full year of an operating integrated service area, and this year constitutes the period the commission used in determining the uniform rate.   The company filed reports of operations for the year 1959 with the commission, which reports complied with the provisions of PA 1909, No 106, § 6, as amended (CL 1948, § 460.556 [Stat Ann § 22.156]), authorizing the commission to require electric utilities to file "a verified report upon such form and giving such information as will enable the commission to better discharge the duties im-

posed upon it." These 1959 reports were on the same form as the reports the company filed with the Federal power commission.

Public hearings were held before the commission on September 20, 1960, October 17, 18, and 19, 1960, and June 21 and 22, 1961.

The company's original proposal included a change in rate for electric power supplies to REAs (Cooperative Rural Electrification Associations) that rendered electric service to certain rural areas.

Two REAs intervened and the commission granted petitions to be separated and severed from the proceedings after the company and the REAs had advised the commission that they thought they could work out the particular problems peculiar to the company rendering wholesale service to REAs.

At the conclusion of hearings, the commission issued an opinion, and we quote from that opinion as follows:

"5. The calendar year 1959 was the first full year of operations of the integrated service areas as one integrated system of the company. The following table sets forth the commission staff's analysis of the company's integrated system results of operations for 1959 under existing rates and charges:

| | | |
|---|---:|---:|
| "Operating revenues | | $6,020,600 |
| Operating expenses | $3,592,700 | |
| Depreciation and amortization | 609,500 | |
| Taxes | 638,000 | |
| Operating revenue deductions | | $4,840,200 |
| Net operating income | | $1,180,400 |
| Average net plant plus working capital | $18,539,100 | |
| Rate of return | 6.36% | |

"From the foregoing it can be seen that according to commission staff calculations the net operating income for the period was $1,180,400, resulting in a rate of return of 6.36% on the average rate base (including the company's net plant investment and an allowance for working capital) of $18,539,100. The net operating income was not in excess of the amount required by the company to maintain its financial standing and capital-raising ability at satisfactory levels. Accordingly, from the standpoint of the company's customers, such net operating income was just and reasonable.

"6. The proposed uniform rates have been designed to produce essentially the same amount of revenues by classes of customers as was realized by the company during the 12-month period ending December 31, 1959. Naturally, this could not be accomplished to the exact dollar and cent, and consequently, on an overall basis the proposed uniform rates, based on 1959 operations, would have produced for the company some $12,000 to $13,000 less gross annual revenues than the company actually earned during this period. This amount is a recomputation of the approximate $5,000 reduction in annual revenues, testified to and indicated in exhibits and results from the severance from this case of determination of proper rates, rules and regulations governing electric service by the company to rural electric cooperatives, as provided in our order of April 13, 1961. Accordingly, in light of our findings in paragraph 5, the net operating income which would have been produced by the company under the uniform rates likewise would not have been in excess of the amount required by the company to maintain its financial standing and capital-raising ability at satisfactory levels. Upon the basis of all the evidence before us, and giving due weight to all lawful elements properly to be considered, the proposed uniform rates are just, reasonable, and will not produce any excess earnings.

"7. Evidence submitted in this case and the records and files of the commission establish conclusively that the 4 former separate service areas of the company are now physically interconnected and the company operates these interconnected facilities as an integrated system. Electric energy enters this system from the several generating plants and purchased power connections operated by the company and flows through the system to satisfy the service requirements of all customers connected to this integrated system.

"The proposed uniform rates are in the public interest and should be approved by the commission so that the company's customers throughout its integrated system will be charged the same rates or charges for like contemporaneous services rendered under similar circumstances and conditions. The record in this matter contains no evidence to justify the continuation of historical rates presently in effect with their resulting disparities and rate differentials. There is no evidence in the record that any community or municipality served by the company's integrated system is served under facts, circumstances or conditions to justify the continuation of existing rate disparities or differentials. All customers in the integrated service areas of the company are served from a physically interconnected service electric system; and a dependable supply of electric energy has been made available throughout this integrated system because of the strategic location of generating capacity, resulting in the availability of service to many customers from more than 1 direction as a protection against outages from natural hazards. The consolidation of the 4 former separate service areas into 1 integrated system has resulted in the rendering by the company of more adequate and dependable electric service.

"There is no fact, circumstance or competent evidence in this case to support the contention of the cities of Ishpeming or Munising or any other municipality in the company's integrated service areas

that it is not in fact a part of the company's integrated system; and the integrated service areas of the company as shown on exhibit Q do in fact constitute an integrated system operated as such by the company."

The record discloses that the appellant was fully advised of the fact the commission intended to make a finding based in the main upon the 1959 monthly and annual reports of the company, and that appellant had ample opportunity to examine and study these reports is disclosed by the concluding testimony of appellant's public utility consultant, Dr. John Bauer, who, upon cross-examination, said:

"*Q.* One further question, Dr. Bauer. You do know, do you not, that the company's 1959 annual report on FPC form No. 1 was in fact turned over to the city of Ishpeming around the early part of April, 1961?

"*A.* I don't know when it was turned over. I had, however, for my survey, that copy of the report, and I went through the copy of the report and the 1960 report.

"*Q.* And the 1960 report?

"*A.* I went through both of them."

Dr. Bauer is a public utility consultant associated with Public Administration Service, of Chicago, and he had, during the years 1944 and 1945, made a study of gas and electric rates for Ishpeming, Munising, and Negaunee when Cliffs Power & Light Company and the Michigan Gas & Electric Company (defendant company's predecessors) were furnishing service, and in that regard he testified that in making his report he worked in the commission's office and obtained data from the company, but he did not appear at the hearing.

Testifying in regard to the present hearing, he stated that the city gave him the exhibits that were used by the commission in making its determination;

that he made a study of these exhibits, but that he could not determine a just and reasonable rate be- cause the reports failed to set forth the cost of transmitting electric power to Ishpeming and other localities in the area.

Dr. Bauer stated that the contemplated area was one of the most unusual—in fact, an area such as he had never come in contact with before, because within the area there were 3 incorporated cities, namely: Ishpeming, with a population of 8,857; Hancock, with 5,022; and Munising, with 4,228; and incorporated villages, such as Ahmeek, with a popu- lation of 265; Calumet, 1,139; Copper City, 293; Houghton, 3,393; Lake Linden, 1,318; Larium, 3,058; and Ontonagon, 2,358, "a total of 11 cities, 11 incorpo- rated places," and, in addition, "there are 79 unin- corporated places that are furnished distribution."

An analysis of Dr. Bauer's testimony leads to the conclusion that his objections were directed toward the so-called integrated area because not only of the variance between cities, villages, and other units receiving power, but the proposed area was artifi- cially conceived, stating, "Now, take those long transmission lines between the eastern territory and the western territory.  There is apparently vacant territory or areas in between.  Those areas are simply interconnected.  They are not integrated, no."

An examination of his testimony also discloses that he objected to the contemplated integrated area because the commission failed to give proper con- sideration to the historical background, stating, "I think you can't ignore the historic developments and take 1 community that has historically had lower rates than another community with historically higher rates and they are all brought in here and ignore the historic background completely."

Dr. Bauer admitted that he was not in a position to make any recommendations as to rates for various

communities; that he had not traveled in much of any of the Upper Peninsula, and he answered the question: "Have you made any study of the conditions of service and the rendering of electric service by the company within any of those communities?" by stating, "The answer is no."

Dr. Bauer in no way challenges the integrity of the annual or monthly reports of the company, and there is no testimony offered by him in regard to the cost of producing electric power, or the returns that were received for producing same.

Dr. Bauer was appellant's only witness who offered testimony in regard to the annual or monthly reports, as appellant's other witnesses dealt with facts surrounding the ordinances, franchises, contracts, et cetera.

Dr. Bauer's opinion was not shared by John H. Warden (president of the company), as is disclosed by the following cross-examination of Mr. Warden:

"*Q*. Now, in arriving at these uniform rates that you have proposed, Mr. Warden, have any factors been taken into consideration as to the differences of the areas one from another?

"*A*. There is no difference in the areas, as far as I know of.

"*Q*. Can you say, then, that if you have a production plant with a transmission line of 100 miles, it would be no different than a production plant with a transmission line of 50 miles?

"*A*. No, not necessarily.

"*Q*. There would be no difference there at all?

"*A*. No. You serve the whole area. If you have production plants at both ends of the system, anything that goes in between there, I'd say no difference in them at all.

"*Q*. If 1 of the areas is lying on the outside, or the perimeter of the integrated system, wouldn't that make a difference?

"*A*. Not necessarily, no.

"*Q.* Wouldn't you take into account factors such as additional cost of transmission lines or different costs of maintenance, or what other factors that you might have?

"*A.* According to the uniform rates, you should take into consideration on an integrated system the cost in the whole area. They are all taken in. You take the power that comes into a pool. You do not know where it goes, how it is served.

"*Q.* But then isn't that grounds for discrimination, if you are going to have 1 unit being served, like I say, on the outside, the perimeter, is going to pay the same amount as the unit that is right next to the production plant?

"*A.* No; that is common practice. I say you can't say every mile you should charge something. You have to have some basis of rates for uniformity. You can't take every customer. If you did, you would have to take every customer and say a rate for every customer based on the miles of transmission, distribution and everything else."

There is no merit to appellant's claim that the severance of REAs prejudiced appellant in such a manner as to destroy the rate as a uniform rate.

The commission was justified in allowing REAs and the company an opportunity to work out the particular problems peculiar to the company rendering of this service with the understanding that the commission would take such action, ultimately, as was necessary to protect the public interests and the respective rights of the parties.

The company did not profit by the severance, because, as noted above, the final order of the commission resulted in a reduction of company revenues by $12,000, and if the severance had not been granted the reduction would have been only $7,000. This was a proper exercise of the commission's jurisdiction with respect to a special contract involving wholesale of electric power.

There was competent evidence to support the commission's findings, as follows:

(1) That the 4 separate service areas of the company are physically interconnected and are operated as an integrated area and the consolidation of the 4 former separate areas into 1 integrated system has resulted in the rendering of a more dependable electric service;

(2) There is no evidence in the record that appellant is entitled to a continuation of existing rate disparities or differentials, or that appellant is not part of the company's integrated system;

(3) The uniform rates are in the public interest and are approved by the commission so the customers throughout the area will be charged the same rates for like service rendered under similar circumstances and conditions;

(4) The net operating income resulting in a rate of return of 6.36% was not in excess of the amount required by the company to maintain its financial standing and capital-raising ability at satisfactory levels, and this rate constituted a fair rate to the consuming public.

3. Appellant contends that the Michigan Public Service Commission was not legally "authorized to take judicial notice of information contained in its file but not offered in evidence at the hearing being conducted."

Appellant claims that nothing can be treated as evidence which is not introduced as such, and that material and data were improperly relied upon by the commission which were not introduced at the hearing, and, contending this is reversible error, cites in support of such argument *Dation* v. *Ford Motor Co.,* 314 Mich 152 (19 NCCA NS 158), and *L. A. Darling Company* v. *Water Resources Commission,* 341 Mich 654.

The *Dation Case* involved the constitutionality of a provision of the workmen's compensation law which empowered a medical commission to make conclusive findings as to the condition of employees alleged to be suffering from occupational disease. In finding that such provision was unconstitutional, our Court stated (pp 167, 168):

"No record is directed to be kept by the medical commission; and only the conclusion reached is required to be submitted to the department of labor and industry. Neither employee nor employer is afforded an opportunity before the medical commission to explain or rebut the showing on which the conclusion is based. Evidence not made a part of the record cannot be reviewed by the court for the purpose of determining whether an order based thereon has requisite support. There is no requirement with reference to notice and the right to a fair hearing is not safeguarded. Such rights are, however, guaranteed by both State and Federal Constitutions."

In the *Darling Case* we were concerned with an appeal from a statutory hearing before the water resources commission. The record in that case established that no witnesses were sworn, no exhibits were identified, and that the material and data relied upon by the commission in making its final order were not introduced by the commission, and no findings of fact were made by the commission. Under those conditions our Court held that the proceedings before the water resources commission had been a violation of procedural due process.

There is no similarity between *Dation* and *Darling* and our present case.

42 Am Jur, 1962 Cum Supp, Public Administrative Law, p 55, contains the following:

"Formal introduction of evidence upon which an administrative decision is based is not necessary

where all the parties know that such evidence has been received by the administrative authority."

The record sustains the following statement of the company:

"The record in this case is clear that the appellant well knew the official reports of the company were studied and relied upon by the commission and its staff; appellant had full and adequate opportunities to investigate the data and information contained in such reports; appellant made no objections to commission staff conclusions and testimony based upon such official reports; appellant has never claimed the information contained in said reports is untrue or unreliable or that such information has been in any manner misinterpreted; and there is no claim of resulting prejudice from the commission and its staff relying upon the facts and information contained in said reports. Appellant merely says the commission had no legal right to take judicial notice of these official reports and acted arbitrarily and unlawfully in so doing."

We find that the appellant was in no way prejudiced by the failure to make a formal introduction of the exhibits, and conclude there is no merit to appellant's contention that the decision of the commission was erroneous and should be set aside because of said fact.

4. Appellant claims the court erred in holding that the matter of instituting and conducting the hearing did not violate due process.

The statutory provisions (PA 1909, No 300, § 26, as amended [CLS 1956, § 462.26 (Stat Ann 1961 Cum Supp § 22.45)])* provides as follows:

"In all actions under this section the burden of proof shall be upon the complainant to show by clear and satisfactory evidence that the order of the

* See CL 1948, §§ 460.4, 460.54 (Stat Ann §§ 22.13[4], 22.4).—
Reporter.

commission complained of is unlawful or unreasonable, as the case may be."

This Court has made it clear that we will not substitute our judgment for that of the commission on issues of fact where the commission's findings are supported by competent evidence, and it must be shown that the commission failed to follow some mandatory provision of the statute or was guilty of an abuse of discretion in the exercise of its judgment, before we supplant the decision and order of the commission with a decision and order of this Court. See *J. E. Bejin Cartage Company* v. *Public Service Commission,* 352 Mich 139; *Giaras* v. *Public Service Commission,* 301 Mich 262; *Grand Rapids & Indiana R. Co.* v. *Michigan Railroad Commission,* 188 Mich 108 (PUR1915F, 805).

We agree with the following statement of the attorney general in his brief on behalf of appellee commission:

"The plaintiff has not seriously contended that the commission has no jurisdiction to remove discrimination—neither has there been a serious contention that discrimination should be allowed to exist unchecked. The plaintiff has merely questioned the means by which the commission acted to end the discrimination, saying that the commission must consider the elements normally considered in a traditional 'rate case.' However, there was sufficient evidence presented for the commission to determine the reasonableness of the uniform rates and the resulting earnings of the company."

The legislature did not define a formula or an exact procedure, but commanded that "in determining the proper price, the commission shall consider and give due weight to all lawful elements properly to be considered to enable it to determine the just and reasonable price to be fixed for supplying electricity." (CL 1948, § 460.557 [Stat Ann § 22.157].)

This legislative mandate was fully met by the commission.

The decree of the circuit court for Ingham county is affirmed. No costs, a public question being involved.

CARR, C. J., and DETHMERS, BLACK, KAVANAGH, SOURIS, JJ., concurred with KELLY, J.

SMITH, J., concurred in result.

O'HARA, J., took no part in the decision of this case.