ASSOCIATION OF BUSINESSES ADVOCATING TARIFF EQUITY v
PUBLIC SERVICE COMMISSION

Docket Nos. 141277, 141284, 142119, 142493. Submitted October 19,
1994, at Lansing. Decided December 29, 1994, at 9:30 A.M.
Leave to appeal sought.

Consumers Power Company filed an application for an electric
rate increase on November 18, 1983, seeking to recover costs
related to the development and construction of a nuclear power
plant at Midland, Michigan. The project was canceled on July
16, 1984, when it was about eight-five percent complete and
after Consumers had invested about $4.2 billion. The Public
Service Commission found that Consumers' decision on July 2,
1980, to go forward with construction of both units at the
facility with the expectation that fuel would be loaded in 1983
was so unrealistic that Consumers had acted imprudently at
that time. The PSC concluded that all expenditures after July 2,
1980, were imprudent and, therefore, recovery of those expendi-
tures was disallowed. The PSC found that Consumers was enti-
tled to about $760 million of rate relief and, after certain
offsets, awarded rate relief of about $346 million, to be collected
over ten years and without interest. The Association of Busi-
nesses Advocating Tariff Equity, Consumers Power Company,
and the Attorney General filed appeals from that decision and
a subsequent decision denying petitions for rehearing. The
appeals were consolidated.

The Court of Appeals *held:*

1. The PSC's use of the prudent investment test was lawful
and reasonable. Once the commission's ratemaking authority is
invoked, the commission may look to all relevant factors in
exercising its broad discretion to determine a just and reason-
able rate.

2. 1982 PA 212, which amended MCL 460.6a(2); MSA
22.13(6a)(2), and the enactment of 1982 ballot proposals D and
H did not eliminate the PSC's ability to rely on the "all lawful

REFERENCES

Am Jur 2d, Public Utilities §§ 135, 188, 190.

Public utility's right to recover cost of nuclear power plants aban-
doned before completion. 83 ALR4th 183.

elements" language in MCL 460.557; MSA 22.157 in setting rates.

3. There was no retroactive ratemaking in this case.

4. Consumers' rates may be based on the prudent cost of doing business, even if that cost includes unsuccessful investments.

5. The PSC did not err in finding that Consumers investors had not been compensated for the risk that the plant would never be completed or that the plant would never be put into use.

6. The evidence supports the PSC's finding that from July 2, 1980, it was not prudent to maintain the strategy of completing both nuclear units at the plant in time to meet the target date set by Consumers and Dow Chemical Company, Consumers' partner in the joint venture. The PSC's decision to disallow all costs associated with the project incurred after the date of imprudence, July 2, 1980, was sound and was consistent with the prudent investment test.

7. The rate relief provided in this case was reasonable. The commission's refusal to offset that relief with construction costs recognized in previous rates was reasonable.

8. The PSC did not change ratemaking methods in this case. The relief that was granted was not so insubstantial as to be confiscatory, unjust, or unreasonable.

Affirmed.

1. PUBLIC UTILITIES — RATES — PRUDENT INVESTMENT TEST.

The prudent investment test may be used in determining utility rates; the test provides that a utility may be compensated for prudent investments at their actual cost when made, regardless of whether the investments, in hindsight, prove to be necessary or beneficial.

2. PUBLIC UTILITIES — RATES — PUBLIC SERVICE COMMISSION.

The Public Service Commission is not bound by any particular method or formula in exercising its legislative function of determining just and reasonable rates; the commission may consider all lawful elements in determining rates (MCL 460.557; MSA 22.157).

3. PUBLIC UTILITIES — RATES.

A public utility has a right to a just and reasonable rate of return on its investment and may not be limited to rates that are so insubstantial as to be confiscatory.

*Hill Lewis* (by *Roderick S. Coy, Timothy P.*

*Collins,* and *Joseph R. Assenzo*), for the Association of Businesses Advocating Tariff Equity.

*David A. Mikelonis, James E. Brunner,* and *H. Richard Chambers,* and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting, P.C.* (by *Michael G. Oliva* and *Ronald W. Bloomberg*), for Consumers Power Company.

*Don L. Keskey, Henry J. Boynton, Philip J. Rosewarne,* and *Patricia S. Barone,* Assistant Attorneys General, for the Public Service Commission.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Luis F. Fernandez* and *Paul E. Novak,* Assistant Attorneys General, for the Attorney General.

Before: NEFF, P.J., and MARILYN KELLY and P. R. JOSLYN,* JJ.

PER CURIAM. These four consolidated appeals as of right, MCL 462.26; MSA 22.45, are from a May 7, 1991, decision of the Public Service Commission (PSC) and a July 1, 1991, PSC decision denying petitions for rehearing. The PSC case, No. U-7830 Step 3B, involved a request by Consumers Power Company for rate relief of over $2 billion. The PSC found that Consumers was entitled to about $760 million of rate relief. After certain offsets, the net award was about $346 million, to be collected over ten years and without interest. We affirm.

I

Consumers filed an application for an electric

---

* Circuit judge, sitting on the Court of Appeals by assignment.

rate increase on November 18, 1983, No. U-7830, seeking to recover costs related to the development and construction of a two-unit, 1,300 megawatt, nuclear power plant at Midland, Michigan. Plans for the plant were announced in 1967. Consumers canceled the project on July 16, 1984. According to Consumers, the plant was then eighty-five percent complete and Consumers had invested approximately $4.2 billion in the project.

Construction of the nuclear facility was fraught with difficulties and delay. One witness characterized the cost to remedy a problem of improperly compacted soil as equivalent to paying for a third reactor. The Atomic Energy Commission and subsequently the Nuclear Regulatory Commission (NRC) maintained oversight of the project. The NRC found serious quality assurance and quality control problems. In the aftermath of the accident at Three Mile Island in Pennsylvania on March 19, 1979, federal authorities increased their regulatory vigilance.

At its inception, the Midland project was a joint venture of Consumers and Dow Chemical Company. Dow's eventual financial stake in the project amounted to about $500 million. Consumers and Dow negotiated a contract in June 1978 that permitted Dow to walk away from the project without liability unless both nuclear units were in commercial operation by December 31, 1984. This date became known as the "drop dead" date.

The architect, engineer, and primary contractor for the project, Bechtel Power Corporation, prepared analyses known as "forecasts" regarding the course of the project to completion. In late 1979 or early 1980, Bechtel developed "Forecast 6." It forecast the "most probable fuel load dates" for Unit 2 to be in April 1984 and for Unit 1 to be in September 1984. It was highly unlikely that these

load dates would permit commercial operation of both the reactors by the drop dead date.

In February 1980, Consumers and Bechtel tried to improve the construction schedule in order to allow for a November 1983 load date. However, a review team made up of Consumers' personnel did not seriously question the conclusions in Forecast 6, but concluded that a November 1983 load date was as "aggressive" a plan as could be realistically pursued.

At a March 5, 1980, meeting of Consumers' directors, management presented Forecast 6 as well as a "breakeven study" and a study regarding alternatives for the project known as the "Midland Alternatives Study." A virtual doubling in the expected cost of the plant was explained to the directors in March 1980. The directors approved a resolution authorizing the company to proceed with construction of both units in accordance with the Forecast 6 estimates.

A revised version of Forecast 6 was issued by Consumers' review team on May 5, 1980. The report characterized a November 1983 fuel load date as "very optimistic." A "schedule analysis" prepared by June 1980 gave a ten percent probability of loading fuel by November 1983 (given favorable assumptions), a fifty percent probability of loading fuel by February 1984, and a ninety percent probability of loading fuel by April 1984.

At a board meeting on July 2, 1980, Consumers' directors considered revised Forecast 6 and the review team's analyses. There was also discussion of potential problems with federal regulatory approval. Management recommended adopting a schedule that anticipated loading fuel in July and December 1983. The directors adopted the recommendation.

After July 1980, the project continued to experi-

ence difficulties, some regulatory and some financial. In December 1982, federal authorities ordered a partial halt to construction because of quality assurance problems. Apparently no further significant construction occurred. Dow withdrew from the project in July 1983. On July 16, 1984, Consumers' directors halted construction completely.

II

Shortly after Consumers ceased construction on the plant, it filed an amendment to its pending electric rate application in No. U-7830 seeking to recover its entire investment in the Midland project. Although Consumers claimed a cost of over $4 billion, its request was eventually reduced to about $2.1 billion, for various reasons. Consumers sought relief in three steps. Step 3 initially sought several hundred million dollars for the cost of the project. Step 3 was subsequently divided into Steps 3A and 3B, with Step 3A being a request for several hundred million dollars of immediate rate relief known as "financial stabilization" relief because of Consumers' precarious financial situation. This appeal deals with Step 3B, in which Consumers sought relief for the balance of its investment in the Midland project.

This Court previously affirmed the psc's decision in Step 2, *Consumers Power Co v Public Service Comm No 1,* unpublished opinion per curiam of the Court of Appeals, decided January 14, 1991 (Docket Nos. 102652, 103983, 105990, and 117930). The psc's decision in Step 3A was also affirmed. *Attorney General v Public Service Comm,* 189 Mich App 138; 472 NW2d 53 (1991) [*Attorney General I*].

The proceeding in this case, Step 3B, involved three hundred days of hearings and resulted in a

record of about 39,000 pages of testimony and 2,400 accepted exhibits. The hearing referee recommended rate relief of $1.3 billion based on project costs incurred until December 2, 1982. This recommendation was consistent with the position of the PSC staff.

The PSC found that Consumers' decision on July 2, 1980, to go forward with construction of both units with the expectation that fuel would be loaded in 1983 was so unrealistic that Consumers acted imprudently at that time. The PSC concluded that all expenditures after July 2, 1980, were imprudent and, therefore, the PSC disallowed recovery of those expenditures. The PSC permitted Consumers to recover about $760 million, which was then reduced by certain amounts including the amount of financial stabilization rate relief granted in Step 3A.

In its opinion, at 199-202, the PSC explained that from July 2, 1980, Consumers adopted a path that was virtually certain to fail and was unduly influenced by its relationship with Dow at the expense of its obligations to ratepayers.

> By early 1980, Consumers' management and Board of Directors knew or should have known that construction of the Midland plant was not going well. They knew or should have known as they faced critical decisions in 1980 that the probability of success was unacceptably low. Although the Commission recognizes the company's duty to its shareholders, it also had a duty to its ratepayers. Consequently, prudence would have required Consumers' management to recommend and the Board of Directors to approve at the July 2, 1980 meeting a decision to alter their strategy of continuing at all costs to try to meet the Dow drop-dead date without adequate consideration of the company's duty to its ratepayers. The path chosen by the company was so risky that it had by then become

clear that it was virtually certain to fail at enormous cost to the company's ratepayers or investors or both.

\*   \*   \*

As the project strove to maintain progress against this background of ongoing problems, Consumers commenced a period of planning and decision-making in late 1979 that culminated in the July 2, 1980 decision of its Board of Directors to continue the project on the basis of Adjusted Forecast 6, which estimated project costs of $3.1 billion and projected a July 1983 Unit 2 fuel load date. In adopting this schedule, Consumers' management and Board of Directors ignored the recommendations of both the primary contractor and the company's own internal review team and disregarded several schedule evaluations of the work remaining to complete the project. They were fully aware of the previous history of construction deficiencies, quality assurance breakdowns, and unmet regulatory expectations, which, if not resolved, would continue to hinder progress and pose a threat of even greater cost increases and schedule delays than those experienced as of mid-1980. Further, the company was aware that resolving these problems would be increasingly difficult, given the NRC's implementation of heightened safety standards after the Three Mile Island accident.

Consumers' approach to planning placed a high priority on retaining Dow's participation in the project, a priority that distorted the company's ability to fairly and objectively analyze the implications of its decisions relative to its duty to serve its ratepayers. . . .

\*   \*   \*

The Commission finds that a full acknowledgment of the risks of continuing the project, evaluated in light of the best interests of the company's ratepayers, would have compelled the conclusion that maintaining the strategy of completing both units to meet the Dow target date was no longer a prudent course of action.

The PSC, at 210-211, found that Consumers was imprudent in accepting the fuel load dates projected in the final version of Forecast 6.

> In light of the insubstantial reasons for the company's optimism about improving upon the schedule recommended by Bechtel in Preliminary Forecast 6, the risks of adverse scheduling effects that the project faced in 1980, and the company's motivation to create an outward appearance that the Dow contract would be met, it is difficult to believe that the schedule adopted in June 1980 was even then regarded by Consumers as realistic and achievable. It is not apparent that the company took reasonable measures to verify that its forecasts were realistic and provided a reliable basis for planning. The company's approach to forecasting, planning, and decision-making, viewed in a most favorable light, reflects willful indifference to known circumstances and indicators of risk. Viewed less favorably, it is certainly plausible, if not likely, that the company deliberately engaged in a policy of obfuscation, distortion, concealment, and deception. Regardless of which explanation best characterizes the subjective deliberations of the company's management and Board of Directors, it is objectively evident that their decisions in mid-1980 were completely divorced from the reality of the project's circumstances. The Commission finds no merit in Consumers' insistence upon the reasonableness and correctness of its decision to continue the project pursuant to a schedule based upon a July 1983 Unit 2 fuel load date. The Commission further finds that the decisions made by Consumers' management in June 1980 and ratified by its Board of Directors on July 2, 1980 were unreasonable and imprudent.

III

The PSC applied the "prudent investment" test

to determine the extent of Consumers' recovery of its investment in the canceled nuclear plant. The prudent investment test has been recognized as a valid basis for determining utility rates. The United States Supreme Court recognized the test in its discussion in *Duquesne Light Co v Barasch,* 488 US 299, 309; 109 S Ct 609; 102 L Ed 2d 646 (1989). The Court traced the test to a 1923 decision, *Missouri ex rel Southwestern Bell Telephone Co v Public Service Comm of Missouri,* 262 US 276, 291; 43 S Ct 544; 67 L Ed 981 (1923). As described in *Duquesne,* under the prudent investment test a utility is compensated for prudent investments at their actual cost when made, regardless of whether the investments proved to be necessary or beneficial in hindsight.

## A

The prudent investment test has been accepted in several states. For example, *Violet v Federal Energy Regulatory Comm,* 800 F2d 280 (CA 1, 1986), discussed application of the prudent investment test in Rhode Island and mentioned the application of the test in Massachusetts. Many cases in which the prudent investment test has been applied are collected in anno: *Public utility's right to recover cost of nuclear power plants abandoned before completion,* 83 ALR4th 183.

The prudent investment test has been used in Michigan. *Re Detroit Edison Co,* 52 PUR4th 318 (1983) [*Detroit Edison I*], see 83 ALR4th, *supra* at 211, dealt with losses associated with the canceled Greenwood nuclear power plant project. The PSC there mentioned having previously applied the prudent investment test in at least two similar cases, one in 1975 and one in 1976. In addition, the PSC applied the test to Consumers' Marysville syn-

thetic gas plant when it was "mothballed." That PSC decision was affirmed by this Court in *ABATE v Consumers Power Co,* unpublished opinion per curiam of the Court of Appeals, decided November 2, 1988 (Docket Nos. 102080 and 102068).

B

Appellants, the Association of Businesses Advocating Tariff Equity (ABATE) and the Attorney General, argue that the PSC was without authority to apply the prudent investment test. But the test is well recognized and appellants' argument is contrary to the principle that the PSC is not bound by any particular method or formula in exercising its legislative function to determine just and reasonable rates. *Building Owners & Managers Ass'n of Metropolitan Detroit v Public Service Comm,* 424 Mich 494, 510; 383 NW2d 72 (1986); *Michigan Bell Telephone Co v Public Service Comm,* 332 Mich 7, 36-37; 50 NW2d 826 (1952) [*Michigan Bell I*]. Appellants have failed to show that using the prudent investment test was unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8); *CMS Energy Corp v Attorney General,* 190 Mich App 220, 228; 475 NW2d 451 (1991).

ABATE and the Attorney General contend that the PSC has no authority to apply anything other than the "used and useful" test in setting rates. They contend that, under that test, rates must be based on a utility's cost of providing service and that a plant that is not used and useful is never part of the cost of providing service. These appellants rely in part on MCL 460.6a(2); MSA 22.13(6a)(2), which defines a "general rate case" as a proceeding to increase rates on the basis of "the utility's total cost of providing service."

The PSC may consider "all lawful elements" in

determining rates. MCL 460.557; MSA 22.157. This section of the transmission of electricity act provides a nonexclusive list of factors that the PSC may consider in determining rates, including cost, fair value of property used, obsolescence, and risks of business. Here, the PSC properly looked to the "all lawful elements" language of § 7 for guidance when it determined it had the authority to apply the prudent investment test. The PSC is vested with all the power to regulate utilities granted in the numerous acts governing utilities. MCL 460.6; MSA 22.13(6).

The argument that the PSC could not rely on § 7 was rejected by this Court in *Attorney. General I, supra* at 144-149, a case dealing with Step 3A of this same PSC case. Once the PSC's ratemaking authority is invoked—as it has been in this case—the PSC may look at all relevant factors in exercising its broad discretion to determine a just and reasonable rate.

Appellants argue that our Supreme Court has indicated that Consumers may not recover its investment in the Midland plant if it is never used, citing *Attorney General v Michigan Public Service Comm,* 412 Mich 385; 316 NW2d 187 (1982) [*Attorney General II*]. That case dealt with statutes governing the issuance of financial securities by a public utility, MCL 460.301 *et seq.*; MSA 22.101 *et seq.*, and involved securities being sold by Consumers to finance the Midland nuclear project. At one point, the Court indicated that a utility proceeding with a construction project without PSC approval did so at the risk that the project costs might not be reflected in future rates. The Court, at 418, stated that utilities "may indeed be betting the company on the wisdom of their decisions to build nuclear generating plants . . . ." But as explained in *Attorney General I, supra* at 143, our

Supreme Court did not mean that all costs associated with an abandoned plant are unreasonable or that a utility may not recover its reasonable and prudent investment in an unused plant.

The PSC explained that prudent expenditures were part of the total cost of providing service. The Attorney General argues that this is not logical because the Midland plant never provided service. The Attorney General's argument is inconsistent with the prudent investment test under which the end result of a utility's efforts do not determine how much is recoverable. Rather, utilities are compensated for prudent investments at their actual costs when made regardless of whether the investments are deemed necessary or beneficial in hindsight.

The Attorney General argues that 1982 PA 212, which amended MCL 460.6a(2); MSA 22.13(6a)(2), and 1982 ballot proposals D and H eliminated the PSC's ability to rely on the "all lawful elements" language in MCL 460.557; MSA 22.157. These arguments are meritless. The changes in 1982 were not concerned with what standards to use in general rate cases. The legislation and the ballot proposals were concerned with automatic purchase power adjustment clauses. See *ABATE v Public Service Comm,* 430 Mich 33; 420 NW2d 81 (1988); *In re Proposals D & H,* 417 Mich 409; 339 NW2d 848 (1983).

It is argued that the PSC's decision, based on the prudent investment test, is unlawful because it constitutes retroactive ratemaking. Retroactive ratemaking in utility cases is prohibited. *Bd of Public Utility Comm'rs v New York Telephone Co,* 271 US 23; 46 S Ct 363; 70 L Ed 808 (1926); *Detroit Edison Co v Public Service Comm,* 416 Mich 510, 523; 331 NW2d 159 (1982) [*Detroit Edison II*]; *Michigan Bell Telephone Co v Public Service*

*Comm,* 315 Mich 533, 547, 554-555; 24 NW2d 200 (1946) [*Michigan Bell II*].

> [T]he essential principle of the rule against retroactive ratemaking is that when the estimates prove inaccurate and costs are higher or lower than predicted, the previously set rates cannot be changed to correct for the error; the only step that the MPSC can take is to prospectively revise rates in an effort to set more appropriate ones. *Detroit Edison II, supra* at 523.

There was no retroactive ratemaking in this case. As explained by the PSC, it followed accepted regulatory and accounting practices. Construction costs were capitalized and then amortized as a current expense. As explained by the PSC in its opinion at 247:

> [C]onsistent with past ratemaking practice, when capitalized expenditures are amortized, the amortization becomes a current expense even though it reflects expenditures that were capitalized in the past. As such, recognition of the amortization does not constitute retroactive ratemaking.

Conceptually, ratepayers are charged for the amortization expense when it occurs and, therefore, rates coincide with the expense and are not retroactive. Essentially the same accounting treatment was used for Consumers' Marysville plant and for Detroit Edison's Greenwood plant in PSC Case No. U-6474. *Detroit Edison I, supra.* According to the PSC in No. U-6474, the majority of state commissions that have addressed the issue of recovery of costs following the abandonment of a nuclear plant project have allowed recovery through amortization.

ABATE argues that the effect of the PSC's order

was to unlawfully charge ratepayers for past capital losses or, in effect, to force ratepayers to make capital contributions. This argument also fails to recognize that rates may be based on the prudent cost of doing business, even if that cost includes unsuccessful investments.

The reasoning of ABATE and the Attorney General essentially eliminates the prudent investment test, because either rates would have to cover all expenses as they were incurred or no rates could ever be charged for an unsuccessful plant investment. This is contrary to the rationale of the prudent investment test that provides for compensation for prudent investments irrespective of whether they are deemed necessary or beneficial in hindsight. *Duquesne, supra* at 309.

Finally, ABATE argues that even if the prudent investment test may be applied in Michigan, it was unreasonably and arbitrarily applied in this case. It is contended that throughout the construction period Consumers' investors received a high return on their Consumers' securities because of the risk that they might not recover any of their investment and that therefore the investors were fully compensated for the risk of total disallowance of the nuclear project. However, the PSC found otherwise. The PSC found that investors had not been compensated for the risk that the plant would never be completed or that the plant would never be put into use. The PSC reached its conclusion on the basis of its finding that when the Midland project commenced, investors reasonably perceived that it would be completed and their investment would be recovered as long as it was prudent. In its opinion, at 260, the PSC found that investors had not been compensated for a risk associated with a "complete disallowance of the

Midland plant investment based upon the application of the used and useful standard."

The PSC essentially made a factual finding regarding the knowledge and intent of investors. Factual findings of the PSC are to be sustained unless they are not supported by competent, material, and substantial evidence. Const 1963, art 6, § 28; *Attorney General I, supra* at 142. The PSC's findings were sufficiently supported by the fact that the PSC had treated similarly other investments of which Consumers' investors were probably aware.

IV

Consumers argues that the PSC acted unlawfully and unreasonably when it concluded that Consumers' decision on July 2, 1980, to proceed with an aggressive construction schedule was imprudent. Consumers argues that the PSC impermissibly judged Consumers' action through hindsight and substituted its judgment for that of Consumers. Consumers further argues that its decision to proceed with the project was reasonable in light of anticipated public demand for power, the availability of financing, and the limited alternatives available. Consumers contends that reasonable persons, including the PSC chairman, agreed that Consumers proceeded reasonably from July 2, 1980.

It is this Court's role to determine whether the PSC's decision was reasonable and lawful. MCL 462.26(8); MSA 22.45(8); *Attorney General I, supra* at 142. Consumers has the burden to prove by clear and satisfactory evidence that the PSC's order was unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8). Consumers must meet this burden in the face of a presumption that the PSC's rate decision was lawful and reasonable. MCL 462.25;

MSA 22.44. In challenging the PSC's determination that Consumers acted imprudently in deciding to proceed as it did on July 2, 1980, Consumers is essentially challenging a factual finding of the PSC. The PSC's factual findings must be supported by competent, material, and substantial evidence. Const 1963, art 6, § 28. This Court will not substitute its judgment for that of the PSC with regard to a factual matter. *Attorney General I, supra* at 142.

There was ample evidence supporting the PSC's determination that from July 2, 1980, the risk of continuing the project compelled the conclusion that "maintaining the strategy of completing both units to meet the Dow target date was no longer a prudent course of action." The PSC reasonably inferred that Consumers' decision was unduly influenced by a desire to develop a schedule that would permit commercial operation before Dow's drop dead date. As pointed out by the PSC, Consumers' decision was made in the face of recommendations by both its primary contractor and its internal review team that it was improbable that the load dates adopted on July 2, 1980, could be achieved. One analysis gave the "aggressive schedule" only a 1.1 percent probability of success. In early 1980, there were also indications of continuing quality assurance and quality control problems. The likelihood of increased federal oversight in the aftermath of the Three Mile Island accident and in light of the previous problems with the Midland project was significant. The construction problems in the past gave little reason to believe that there would be few or no problems in the future, a necessary circumstance for success under the schedule adopted by Consumers. All of these facts and circumstances were known to Consumers in July 1980. The PSC's decision was not based on hindsight.

While it is true that some reasonable persons did not find that Consumers' decision on July 2, 1980, was imprudent (for example the PSC Chairman would not have found Consumers' actions to be imprudent until February 11, 1981, and the hearing referee found an imprudence date of December 2, 1982), this Court's review is of the reasonableness of the PSC's determination. The test is not whether there is any reasonable person who would have concluded that Consumers acted prudently. The determination of prudence is for the PSC. Each individual member of the PSC does not have veto power; nor does the hearing referee. Regardless of the view of reasonable individuals, and regardless of the existence of some evidence to support the views of those reasonable individuals, there was sufficient evidence to support the PSC's finding of imprudence from July 2, 1980.

V

All parties quarrel with the PSC's decision to "disallow" all costs associated with the Midland project incurred after the date of imprudence, July 2, 1980. Consumers argues that some type of power plant was needed to satisfy growing energy demand and that the PSC should have disallowed only those costs that were imprudent or that would not otherwise have been incurred if Consumers had acted prudently. ABATE and the Attorney General argue that because the PSC found that the entire project became worthless because of Consumers' imprudence, it was unreasonable to allow Consumers to recover for any part of the project. All parties at least partly frame their arguments in terms of a "proximate cause" analysis.

The PSC explained that the purpose of its deci-

sion was to allow Consumers to recover its prudent investment intended to benefit ratepayers even though later imprudence rendered the investment unusable. The commission explained that it was not its function to determine what Consumers should have done, but, rather, to assess the prudence of the course chosen by Consumers. In this regard, the PSC found that Consumers' continued efforts to complete both nuclear units as scheduled had "virtually no chance of success" and therefore any expenditures incurred on the project after the date of the decision to continue as scheduled should be disallowed.

The PSC's reasoning was sound and was consistent with the prudent investment test. There was no need for the PSC to determine what Consumers should have done. The PSC made a rate determination based on what Consumers did. The reality was that Consumers proceeded on an imprudent course and not on some other course that might have been prudent. The PSC disallowed costs incurred after July 2, 1980, because those costs were incurred in an imprudent attempt to complete the project. The PSC logically and reasonably disallowed costs associated with the imprudent course that Consumers in fact followed.

The PSC was not bound to follow or adopt a proximate cause analysis, as would be used in a negligence case. In determining rates, the PSC may rely on its expertise and is not required to apply a particular method or process. *Building Owners, supra* at 510; *Ishpeming v Public Service Comm,* 370 Mich 293, 315; 121 NW2d 462 (1963). What is important is whether the result reached is just and reasonable. *Building Owners, supra* at 510. The method employed by the PSC may contain infirmities, but that is not necessarily important. *Id.* The PSC may "make the pragmatic adjustments

which may be called for by particular circumstances." *Michigan Bell I, supra* at 36.

The ratemaking process involves a balancing of investor and consumer interests. *Building Owners, supra* at 510; *Detroit v Michigan Public Service Comm,* 308 Mich 706, 716; 14 NW2d 784 (1944). The PSC permitted Consumers to recover costs it had incurred before acting imprudently and the recovery was spread over a ten-year period without interest. Given that the plant was intended to meet reasonably predicted energy demands of the public, the PSC reasonably balanced the interest of investors and the consuming public.

The PSC merely permitted Consumers to recover its prudent investment, and that investment was not made imprudent by Consumers' subsequent decisions. Under the prudent investment test, the end result does not dictate what can be recovered. The utility is compensated for prudent investments when made, irrespective of whether the investments are deemed necessary or beneficial in hindsight. *Duquesne, supra* at 309.

VI

The PSC recognized that previous PSC decisions related to the Midland project provided Consumers with roughly $1 billion of benefits. ABATE considers it arbitrary and unreasonable on the part of the PSC not to credit ratepayers in the present case with those benefits. More specifically, ABATE points to about $436 million of construction costs that were recognized in Consumers' rate base as construction work in progress (CWIP), an estimated $500 million in increased financing costs that ABATE attributes to the Midland project, and $102 million in "phantom" operating and maintenance (O & M) expenses that were permitted in the Step 3A proceeding (financial stabilization relief).

The PSC rejected ABATE's arguments. The PSC noted that it had knowingly not fully offset CWIP costs in the past. In other words, the PSC concluded in prior rate cases that some portion of the Midland project should be included in Consumers' rate base and should be paid for by ratepayers during the course of construction. The PSC rejected the argument about increased financing costs because of a lack of persuasive evidence to support a finding regarding the extent of the increase in financing costs due to the Midland project. With regard to the O & M expenses, the PSC recognized that Consumers' actual expenses were less than estimated budget levels on which rates were based, but the PSC viewed the "benefit" as part of the financial stabilization effort.

ABATE must prove that the rate relief resulting from the PSC's analysis is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8). What items comprise a utility's investment capital is a factual matter for the PSC. *Attorney General v Public Service Comm #2,* 136 Mich App 515, 520; 358 NW2d 351 (1984).

This Court is not persuaded that the rate relief provided in this case was unreasonable or that refusing to offset that relief with construction costs recognized in previous rates was unreasonable. The PSC reasonably exercised its judgment in declining to offset rates by previously granted rate relief that was based on prudent investment. To some extent, this Court has already considered and rejected arguments similar to ABATE's in *Consumers Power Co v Public Service Comm, supra.* The challenge to the "phantom" O & M expenses was there expressly rejected as was an argument that the PSC should remove the effects of the Midland plant from Consumers' capital structure.

We cannot fault the PSC's refusal to offset rates

based on increased financial costs. There was simply insufficient evidence to determine how much Consumers' financing costs were increased due to the Midland project. The PSC recognized that even without the Midland project Consumers would have prudently attempted to construct a power plant of some sort or to obtain power from some source, efforts that would have required some financing.

With regard to the O & M expenses, the PSC permitted rates to be based on those expenses in a prior case as part of the PSC's overall rate decision in that case. There is no reason to grant an offset in this case based on rates that were lawfully and reasonably determined in a prior case. The prior rate relief was granted for a need existing at that time without any intention that there be a subsequent recovery of the relief granted.

Finally, the PSC recognized that it is virtually impossible to separate individual aspects of rate relief from the overall case. For example, if construction costs had not been passed through to ratepayers in CWIP costs in the past, the rate relief now granted might well have been greater.

## VII

Consumers claims that the PSC granted it so little relief that its right to a just and reasonable return on its investment was violated. A public utility has a right to a just and reasonable rate of return on its investment. *ABATE v Public Service Comm, supra* at 39. Utilities are protected from being limited to rates that are confiscatory. *Duquesne, supra; Michigan Bell I, supra* at 26. Arbitrarily switching back and forth between methods in a way that results in investors bearing the risk of a bad investment while denying them the ben-

efit of a good investment raises "serious constitutional questions." *Duquesne, supra* at 315.

The PSC, however, did not change ratemaking methods in this case. It consistently applied the prudent investment method. Nor was the $760 million in rate relief so low as to be confiscatory or unjust and unreasonable. Consumers argues that the hearing referee's decision awarding $500 million more in rate relief should be reinstated. While $500 million is a substantial sum, Consumers is a large entity and, according to Consumers, the sum is equivalent to about twenty percent of Consumers' rate base excluding its Midland investment. Under the circumstances of this case, we do not find that the failure to obtain an additional $500 million of rate relief makes the PSC's decision confiscatory or unjust and unreasonable.

## VIII

The PSC fairly balanced the interests of ratepayers, Consumers, and its investors.

Affirmed.